**Edward Everette GOETTL, Appellant,**

v.

**The STATE of Wyoming, Appellee.**

**No. 90–284.**

Supreme Court of Wyoming.

Nov. 30, 1992.

Wyoming Public Defender Program: Leonard D. Munker, State Public Defender, Gerald M. Gallivan, Director, Wyoming Defender Aid Program; David M. Wallick, Student Intern, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia Lee Hackl, Deputy Atty. Gen., Jennifer L. Gimbel, Senior Asst. Atty. Gen., D. Michael Pauling, Asst. Atty. Gen., Theodore E. Lauer, Director, Prosecution Assistance Program; Linda D. Burt and Roger E. Cockerville, Student Interns, for appellee.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT,* and GOLDEN, JJ.

THOMAS, Justice.

The only question presented in this case is whether law enforcement officers had probable cause to stop Edward E. Goettl (Goettl) and then to arrest him for possession of a controlled substance with intent to deliver and conspiracy to commit that offense. Relying upon *Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), the trial court ruled that the requisite probable cause was present. Goettl argues a collateral and alternative issue with respect to the denial of a motion

* Chief Justice at time of oral argument.

to suppress all evidence obtained after the stop on the ground the stop was not supported by sufficient probable cause. We agree with the decision of the trial court that this record establishes adequate probable cause to justify the action of the law enforcement officers in stopping Goettl and then arresting him for the offenses with which he was charged. The resolution of that question also determines the question arising out of the motion to suppress because that motion assumed the absence of the requisite probable cause. The judgment and sentence entered by the trial court is affirmed.

In the Brief of Appellant, Goettl submits his statement of the issues as follows:

I. Whether the court below erred when it found that the anonymous tip furnished the necessary indicia of reliability to justify a forcible stop of the Appellant's vehicle.

II. Whether the court below erred by denying the motion to suppress all evidence obtained after the arrest of the Appellant when the arrest was made without probable cause.

In its Brief of Appellee, the State of Wyoming sets forth the issues in this way:

I. Did the information furnished by the anonymous informant, as corroborated by law enforcement officers, exhibit sufficient indicia of reliability to justify the investigatory stop of Appellant's automobile?

II. Was Appellant unlawfully arrested, so as to require suppression of his subsequent confession?

The record demonstrates the following facts that are material to the disposition of this case. At about 3:45 P.M. on Saturday, April 28, 1990, the dispatcher for the Johnson County Sheriff's office at Buffalo received a telephone call from an anonymous informant who claimed knowledge of illegal drug activity. The informant told the dispatcher that Don Goettl, the appellant's brother, had "a lot of acid" and that Don Goettl and Goettl were going to Sheridan to sell it. Apparently, Goettl had come

from Colorado to visit his brother and had brought the LSD to Wyoming with him. The informant advised the dispatcher that the Goettl brothers planned to transport the drugs in Goettl's silver Volvo automobile, bearing Colorado license UKB 606. The informant stated that the vehicle was parked at 178 Western Avenue in Buffalo, which was Don Goettl's address. In addition, the informant told the dispatcher the Goettl brothers were going along with others; they were getting ready to leave; and they would be leaving soon.

The dispatcher then contacted an officer of the Buffalo Police Department and asked the officer to come to the station. After the officer arrived, the dispatcher related the content of the anonymous phone call. About 4:00 P.M., the officer went by Don Goettl's residence at 178 Western Avenue to attempt to verify the information the anonymous informant had furnished. The officer saw a silver Volvo bearing Colorado license plate UKB 606 parked in the driveway of Don Goettl's residence with the passenger door open. The make of car, the license number, and its location all matched the information given by the informant. The officer then left the neighborhood where the residence was situated and drove to the north exit on the route from Buffalo leading to Sheridan. In about twenty minutes, the officer saw the same silver Volvo traveling north on Highway 87 toward the interstate. He could see at least four people in the Volvo. At the time he saw the car with the people in it, the officer was at a pay telephone talking to an agent of the drug task force. That agent then contacted Kevin Hughes, the supervisor of the Northeast Drug Enforcement Team, at about 4:15 P.M. and reported the information he had received from the Buffalo police officer. The information given to Agent Hughes consisted of the substance of what the informant had told the dispatcher, including a description of the vehicle, together with the observations of the Buffalo police officer.

Agent Hughes then left Sheridan and traveled toward Buffalo after using his radio to arrange with officers of the Sheridan Police Department to watch for the silver Volvo in case Hughes missed it. After traveling about five miles south toward Buffalo, Hughes saw the Volvo traveling toward Sheridan. He turned around and followed the Volvo, but missed the Coffeen exit at Sheridan which the Volvo had taken. After Goettl's Volvo turned off the interstate, an officer of the Sheridan Police Department stopped it because of Agent Hughes' earlier request. There were five people in the car: Goettl, Don Goettl, Laura Goettl, Shalom Waltenbaugh and Matthew Demary.

Goettl was driving the Volvo when the Sheridan police officer pulled the vehicle over. Goettl presented a Wyoming driver's license to the officer who made a radio check and learned from the Wyoming Highway Patrol that Goettl's Wyoming driver's license had been suspended. At that time, the Sheridan police officer arrested Goettl for driving while his license was suspended.

Agent Hughes arrived at the Volvo some three or four minutes after it was stopped by the Sheridan police officer. Agent Hughes advised Goettl of his constitutional rights in accordance with the decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974, *reh'g denied*, 385 U.S. 890, 87 S.Ct. 11, 17 L.Ed.2d 121 (1966). Goettl then gave permission to Agent Hughes to search both his person and the vehicle he was driving. That search did not disclose any contraband on Goettl's person. Agent Hughes then requested, and received, consent to search one of the passengers, Matthew Demary. That search revealed a quantity of LSD in the pocket of Demary's trousers. Demary then was placed under arrest by Agent Hughes, and he was advised of his constitutional rights in accordance with the *Miranda* decision. Thereafter, the other occupants of the car, except for Laura Goettl, consented to a search of their persons, but no other contraband was disclosed. All five people were then taken to the police station in Sheridan where they were questioned by Agent Hughes and another Sheridan police officer. In the course of the interrogation that evening,

Goettl made statements to Agent Hughes. Those statements were not recorded, but the contents of the statements were related by Agent Hughes in the course of his testimony at Goettl's trial.

Goettl was charged with possessing a controlled substance, lysergic acid diethylamide (LSD), as defined in Schedule I, Wyo. Stat. § 35–7–1014(d)(xii) (1988), with intent to deliver and with conspiring to deliver that controlled substance, in violation of Wyo. Stat. §§ 35–7–1031(a) and 6–1–303 (1988), respectively.[1] A hearing was held on two different days in July addressing a defense motion to suppress the statements made by Goettl to Agent Hughes while he was under arrest. That motion was denied. At his trial in August, Goettl was convicted of both charges. He then was sentenced to the state penitentiary for a term of not less than three nor more than five years on the charge of possessing the controlled substance with intent to deliver, and he was sentenced to not less than two nor more than five years on the conspiracy charge. Credit was given for 161 days for presentence confinement against Count I, possessing a controlled substance with intent to deliver. Goettl's terms of imprisonment were imposed to run consecutively, but the court ordered that the conspiracy sentence was to be reduced to probation if Goettl successfully completed his sentence on the count of possession with intent to deliver. Goettl appeals from the judgment and sentence.

In *Neilson v. State*, 599 P.2d 1326, 1333 (Wyo.1979), *cert. denied*, 444 U.S. 1079, 100 S.Ct. 1031, 62 L.Ed.2d 763 (1980), this court stated:

> A peace officer may arrest a person without a warrant if, at the moment the arrest is made, he has probable cause to believe that a crime had been committed by the person to be arrested, or he has reasonable grounds to believe that a crime is being committed in his presence by the person to be arrested. Stated another way, the determination of probable cause to arrest without a warrant depends upon whether the facts and circumstances within the peace officer's knowledge and of which he has reasonably trustworthy information were sufficient to warrant a reasonably cautious or prudent man to believe that the person arrested has committed or is committing an offense. The constitutional standard governing probable cause is grounded upon reasonableness. Thus, an appellate court's inquiry into whether or not an arrest is legal in a given case is restricted to an objective consideration of the evidence in the record. (Citations omitted.)

In accordance with *Neilson*, our review is premised upon an objective consideration of the evidence set forth in the record that relates to the issues on appeal.

■ Goettl's initial contention is that the informant's tip, in the case of *White*, 496 U.S. 325, 110 S.Ct. 2412, was more specific than the one provided in this case. Goettl then contends that in *White*, the officers corroborated more of the predictions of future activity than in this case; the officers found less of the informant's tips to be false than in this case; the trial court in *White* had necessary indicia of reliability that is not present here; and, finally, the trial court in this case applied the law from *White* to the facts in a manner that produced a result outside the boundaries established by the court in *White*. Our consideration of Goettl's arguments in light of the record persuades us that the trial court

1. Wyo.Stat. § 35–7–1031 (1988) provides, in pertinent part, as follows:
   (a) Except as authorized by this act, it is unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance. Any person who violates this subsection with respect to:
   \* \* \* \* \* \*
   (ii) Any other controlled substance classified in Schedule I, II or III, is guilty of a crime and upon conviction may be imprisoned for not more than ten (10) years, fined not more than ten thousand dollars ($10,000), or both; \* \* \*.
   Wyo.Stat. § 6–1–303 (1988) provides, in pertinent part, as follows:
   (a) A person is guilty of conspiracy to commit a crime if he agrees with one (1) or more persons that they or one (1) or more of them will commit a crime and one (1) or more of them does an overt act to effect the objective of the agreement.

correctly ruled that there was probable cause to stop Goettl and correctly applied *White* to reach its decision.

At the time the trial court addressed the issues in this case, *White* was a very recent precedent. Applying the totality of the circumstances test, the United States Supreme Court held that an anonymous tip encompassing predictions of future activity, the details of which were corroborated by independent police investigation, demonstrated sufficient indicia of reliability to justify an investigatory stop of White's vehicle. The facts in the *White* case, and those in this case, are strikingly similar. In the *White* case, an anonymous individual called the Montgomery Police Department and stated that "Vanessa White would be leaving 235–C Lynwood Terrace Apartments at a particular time in a brown Plymouth station wagon with the right taillight lens broken, that she would be going to Dobey's Motel, and that she would be in possession of about an ounce of cocaine inside a brown attache' case." *White*, 496 U.S. at 327, 110 S.Ct. at 2414. The police officers corroborated the information by observing a woman who did leave the 235 Lynwood Terrace Apartments building and enter a brown Plymouth station wagon with a broken taillight lens. These events occurred within the time frame indicated by the informant, and the woman then took the most direct route to Dobey's Motel. She was stopped by the investigative officers just short of reaching Dobey's Motel. The investigative officers found a locked brown attachè case in the vehicle and, after White provided the combination to the lock on the case, marijuana was discovered. Subsequently, at the police station, the officers discovered a quantity of cocaine in White's purse.

The Supreme Court of the United States, in *White*, acknowledged the fact that the information from the anonymous caller, without more, would not have offered sufficient indicia of reliability to justify this type of investigatory stop. However, when the information furnished to the police by the anonymous informant was combined with the corroboration of that information, including predictions of future activity, the Court held that the degree of reliability did warrant the investigatory stop and further investigation by the police officers. Other federal cases are consistent. *See United States v. Gonzales*, 897 F.2d 504 (10th Cir. 1990) (information conveyed by a confidential informant held to encompass sufficient indicia of reliability to justify an investigatory stop of the vehicle); *United States v. Alvarez*, 899 F.2d 833 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 671, 112 L.Ed.2d 663 (1991) (anonymous tip sufficiently corroborated by police observations so as to furnish the officers with reasonable suspicion necessary for an investigatory stop).

In Goettl's case, a number of facts corroborative of the anonymous tip were verified by the police officers. The Buffalo officer did see several people leaving Buffalo in the silver Volvo automobile bearing Colorado license plate UKB 606, which was owned by Goettl and had been parked at 178 Western Avenue, the home of Don Goettl, within the time frame indicated by the informant. The vehicle was taking the most direct route to Sheridan and, in fact, it was driven to, and arrived at, Sheridan. The information that could not be corroborated consisted of the identity of the persons in the silver Volvo; the presence of "acid" in the vehicle; and the purpose of the occupants of the vehicle to sell the "acid" in Sheridan.

■ As in *White*, there was a degree of particularity in the facts furnished by the anonymous informant, and there also was a prediction of the future actions of third parties. The description of the brown Plymouth station wagon in *White* and the description of the silver Volvo parked at the residence of Don Goettl in this case are examples of facts anyone readily could obtain. The accurate prediction by the informant, however, of future behavior is not something ordinarily, readily, or easily obtained, and that prediction, when corroborated by observation of the police officers, demonstrates inside information or a specific familiarity with the affairs of the persons who are the subject of the tip. When these more specific future events are pre-

dicted, and significant aspects of that prediction are verified, it becomes reasonable for police officers to believe that the informant has furnished reliable information regarding illegal activities of the subjects of the tip. *White.*

*White* is consistent with prior decisions of the United States Supreme Court and fits with cases from this court. In a series of cases that began with *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court has recognized that police officers may, without infringing upon the Fourth Amendment to the Constitution of the United States, briefly stop a moving automobile to investigate their reasonable suspicion that the occupants are involved in illegal activity. After effecting what has come to be known as the "Terry stop," the officers also are permitted to frisk the person upon a reasonable belief that the person may be armed. *Terry.* The test there adopted was whether a reasonably prudent person in the circumstances would be warranted in the belief that his safety or the safety of others could be endangered. This reasonable concern for his own safety justified the officer in stopping and frisking the suspect for a weapon even though there did not exist probable cause for an arrest. *Terry.*

About five years later, in *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the Supreme Court of the United States upheld a "Terry stop" and a frisk undertaken on the basis of a tip received from a previously known informant who had given reliable information in the past. That tip was not verified, but the Court concluded that, even though the information would not have been sufficient to support either an arrest or a search warrant, the information did carry sufficient indicia of reliability to justify a forcible stop. *Adams.*

■ The standard for analyzing the justification in relying upon an informant's tip has culminated in the "totality of the circumstances" test adopted by the United States Supreme Court in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527, *reh'g denied,* 463 U.S. 1237, 104 S.Ct.

33, 77 L.Ed.2d 1453 (1983). In that case, the Court's analysis articulated a requirement that there be a balanced assessment of the relative weights of all the various indicia of reliability, as well as the indicia of unreliability, of the anonymous informant's tip. The Supreme Court of the United States pointed out that it consistently has recognized the value of corroboration of the details of an informant's tip by independent police investigation. Pursuant to *Gates,* the test of the "totality of the circumstances" in the case of a tip by an informant can be summarized as encompassing: (1) the sufficiency of the information set forth in the informant's tip; (2) the prediction of future activity or events by the informant; and (3) some corroboration of the current and predicted future events by the police officers.

In prior cases, this court has recognized the validity of a "Terry stop" and also has adopted the "totality of the circumstances" test. *See Keehn v. Town of Torrington,* 834 P.2d 112 (Wyo.1992). In *Lopez v. State,* 643 P.2d 682 (Wyo.1982), a police officer's independent observations of an automobile and a suspect driving the car which matched descriptions by eyewitnesses were held to be adequate probable cause for an investigatory stop. In *Cook v. State,* 631 P.2d 5 (Wyo.1981), the circumstances that occurred following a robbery, together with reasonable inferences made by an experienced police officer, furnished adequate grounds for an investigatory stop. In *Parkhurst v. State,* 628 P.2d 1369 (Wyo.1981), *cert. denied,* 454 U.S. 899, 102 S.Ct. 402, 70 L.Ed.2d 216 (1981), the police officers were given a description of a car used by two individuals to flee from the scene of the murder, and they also were told the direction the car was traveling. The court held the officers were justified in making an investigatory stop when a car fitting that description was spotted. In the course of developing our state precedent, we consistently have held that something less than probable cause will suffice for an investigatory or "Terry stop." *Simmons v. State,* 712 P.2d 887 (Wyo.1986); *Olson v. State,* 698 P.2d 107 (Wyo.1985); *Lopez; Cook.* "A policeman is not required to

simply shrug his shoulders and allow a crime to occur merely because he lacks the necessary information required for probable cause to arrest. *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). He may make an investigatory stop." *Olson,* 698 P.2d at 109–10.

Examining the "totality of the circumstances" as disclosed by the record in this case, in the light of the decision in *White,* 496 U.S. 325, 110 S.Ct. 2412, we conclude that sufficient probable cause was present to justify the investigatory stop of Goettl's car. We hold that the informant's tip, particularly the prediction of future events, the details of which were verified by the observation of the law enforcement officers, furnished more than adequate probable cause to stop the Goettl vehicle. The subsequent events, including the consensual searches, then justified the arrest of Goettl and the others in the vehicle.

■ Turning to Goettl's contention it was prejudicial error to admit into evidence those things that were seized or statements that were made after the arrest because the arrest occurred without probable cause, we again are in accord with the trial court that there was probable cause to arrest Goettl. The information in the hands of the police officers, following the stop and the consensual searches, constituted probable cause to believe Goettl had committed the offense of possession of a controlled substance with intent to deliver and that he had conspired to commit that offense. The motion to suppress all of the evidence obtained following that arrest properly was denied.

The authority for warrantless arrests in Wyoming is found in Wyo.Stat. § 7–2–103 (1987), which provides, in pertinent part:

(a) A peace officer may arrest a person without a warrant and detain that person until a legal warrant can be obtained when:

(i) Any criminal offense is being committed in his presence by the person to be arrested;

(ii) He has probable cause to believe that a felony has been committed and that the person to be arrested has committed it; or

(iii) He has probable cause to believe that a misdemeanor has been committed, that the person to be arrested has committed it and that the person, unless immediately arrested:

(A) Will not be apprehended;

(B) May cause injury to himself or others or damage to property; or

(C) May destroy or conceal evidence of the commission of the misdemeanor.

The focus of the record inquiry in this case is whether the arresting officer had probable cause to believe that a felony had been committed and that Goettl had committed it to fit the arrest within § 7–2–103(a)(ii).

■ The question that must be resolved is what information will suffice to establish probable cause in the context of a warrantless arrest. The test adopted by this court is that the determination of probable cause to arrest without a warrant depends upon whether the facts and circumstances within the knowledge of the arresting officer and those facts and circumstances about which he has reasonably trustworthy information are sufficient to justify a reasonably cautious or prudent man in the belief that the person arrested has committed, or is committing, an offense. *Neilson,* 599 P.2d 1326. In *Neilson,* the court relied upon *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879, *reh'g denied,* 338 U.S. 839, 70 S.Ct. 31, 94 L.Ed. 513 (1949), and *Beck v. State of Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). In this regard, the following cases from Wyoming also have pertinence. *See Jandro v. State,* 781 P.2d 512 (Wyo.1989); *Ostrowski v. State,* 665 P.2d 471 (Wyo.1983); *Raigosa v. State,* 562 P.2d 1009 (Wyo.1977); *Rodarte v. City of Riverton,* 552 P.2d 1245 (Wyo.1976).

According to the record in this case, most of the information the police officers had at the time of Goettl's arrest came from the telephone call by the anonymous informant. The content of that information was corroborated in several respects by those police officers prior to arresting Goettl. In *Whiteley v. Warden,* 401 U.S. 560, 91 S.Ct.

1031, 28 L.Ed.2d 306 (1971), the United States Supreme Court held that an arresting officer may use information he gathers to bolster a tip by an informant to the point that there exists probable cause for arrest, if the information gathered by the officer is corroborative of the informant's tip. That principle can be applied in this case. The anonymous informant telephoned law enforcement officers at about 3:45 P.M. and stated that Goettl's brother was in possession of "a lot of acid" in Buffalo. The informant said that Goettl and his brother, together with other people, were preparing to leave Buffalo soon to transport the LSD to Sheridan where they expected to sell it. The informant also said that the party would travel in Goettl's silver Volvo, with Colorado license UKB 606, then parked at 178 Western Avenue in Buffalo, the residence of Goettl's brother. Within an hour and a half of the phone call, the law enforcement officers had corroborated the presence of the silver Volvo parked at 178 Western Avenue; the fact that 178 Western Avenue was the residence of Goettl's brother; the Volvo was registered to Goettl; and the Volvo left Buffalo soon afterward with at least four occupants. The officers also established the Volvo was traveling north toward Sheridan and that it was driven on the highway toward Sheridan, leaving the interstate at the Coffeen Avenue exit at Sheridan.

The stop having been justified by the corroboration of the anonymous informant's information, the arresting officers learned, prior to the arrest, that two of the individuals in the vehicle were Goettl and his brother; one of the passengers was Shalom Waltenbaugh; and, after a consensual search of another passenger, Matthew Demary, approximately 165 tablets of LSD were found in Demary's pocket. Additionally, one of the police officers recognized Shalom Waltenbaugh who then was on probation for a violation of the controlled substances laws and was a suspect with respect to selling LSD.

Based upon the information that had come to them from the anonymous informant; the further corroboration of that information by the law enforcement offi-

cers both prior to and after the investigatory stop; and the other information gained at that time, we are satisfied the police officers had the requisite probable cause for a warrantless arrest in accordance with § 7-2-103. This holding is consistent with our ruling in *Cook*, 631 P.2d 5, in which we held that, after police officers have stopped a vehicle for investigatory purposes, they may obtain additional information about the suspects that leads to adequate probable cause for an arrest. That sequential development is what occurred in this case. Goettl's vehicle was stopped, the identities of the passengers and the driver were ascertained, and a controlled substance was found on one of the passengers in the vehicle.

Goettl relies on *Rodarte*, 552 P.2d 1245, to argue that simply being a passenger in a vehicle in which a controlled substance is found is insufficient to establish probable cause for a warrantless arrest. In *Rodarte*, Susan Rodarte and a friend accepted a ride with two men who were in a pickup. Later the pickup was stopped by the police, and the driver was arrested based upon a warrant that previously had been issued charging him with the sale of narcotics. The police had been looking for him to execute the warrant. After two bags of marijuana were discovered on the floor of the pickup, the driver was arrested, along with the other three occupants. This court held that there was insufficient probable cause to arrest Susan Rodarte. Several facts distinguish *Rodarte* from this case. First, *Rodarte* was a civil case in which the appellant claimed a wrongful arrest. Goettl's case is a criminal prosecution in which he alleges that there was insufficient probable cause to stop him and insufficient probable cause to arrest him. In *Rodarte*, the police officers stopped the vehicle because they had a warrant previously issued for the arrest of the driver. They had been looking for him, and it also is true that Susan Rodarte never was arrested for any specific crime.

What distinguishes Goettl's case is that an anonymous informant had given information concerning illegal drug activities.

The primary factor that is not present in *Rodarte* is the informant's tip with respect to the implementation of a plan to sell LSD. In this case, the probable cause requisite for a warrantless arrest was established by the information provided by the anonymous informer, the corroboration by the law enforcement officers, both before and after the investigatory stop, and the additional information discovered after the stop. No statement by the anonymous informant was contradicted or found to be in any way inconsistent with the facts the officers developed.

We hold there was probable cause to arrest Goettl for possession of a controlled substance with intent to deliver it and for conspiracy to commit that offense. The facts and circumstances that were within the knowledge of the peace officers at the time of the arrest, including the information provided by the anonymous informant, furnished adequate probable cause to justify the arrest in this case.

The resolution of the first issue argued by Goettl also leads to the resolution of his second issue. We have held probable cause did exist to stop Goettl and then to arrest him for possession of a controlled substance with intent to deliver it and for conspiracy to commit that offense. The motion to suppress the evidence obtained after the stop was properly denied since the arrest was lawful. The statements that Goettl made while being interrogated by the police officers at a subsequent time at the police station properly were admitted into evidence.

Goettl, in his brief and in his oral arguments before this court, encouraged us to offer greater protection under the Constitution of the State of Wyoming than the protection that has been provided pursuant to the Constitution of the United States. The provisions of the constitutional proclamations are substantially identical. In the Constitution of the State of Wyoming, the following appears:

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause, supported by affidavit, particularly describing the place to be searched or the person or thing to be seized.

Wyo. Const. art. 1, § 4.

The language found in the Fourth Amendment of the Constitution of the United States is:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The only difference in these two provisions is that, under the Constitution of the State of Wyoming, an affidavit is required to support the issuance of a search warrant. Neither U.S. Const. amend. IV nor Wyo. Const. art. 1, § 4 prohibits all warrantless searches and seizures. Only those that are unreasonable are proscribed. *Neilson,* 599 P.2d 1326. This court previously has adopted the standard of reasonableness, which is the federal constitutional standard for searches and seizures. *See Ostrowski,* 665 P.2d 471; *DeHerrera v. State,* 589 P.2d 845 (Wyo.1979); *Raigosa,* 562 P.2d 1009. In addition, this court has adopted the federal test justifying an investigatory stop, which is something less than the information necessary to establish probable cause. *Lopez,* 643 P.2d 682; *Vrooman v. State,* 642 P.2d 782 (Wyo. 1982); *Cook,* 631 P.2d 5; *DeHerrera.*

We are not persuaded in this instance by Goettl's argument that we should expand the rights protected by the Constitution of the State of Wyoming beyond the protection furnished according to the Constitution of the United States. In light of precedent which heretofore has adopted the federal standards, we are satisfied that adopting the argument of Goettl in this regard would simply create an area of the law in which law enforcement officers, prosecutors, and trial courts would be left without a standard. There would be no way to predict what would, or would not, suffice to

establish grounds for an investigatory stop or probable cause to justify a warrantless arrest. We are satisfied that it would be a disservice to structure a situation within the criminal law of the state of Wyoming leading to an *ad hoc* approach in every future instance.

The judgment and sentence is affirmed.

URBIGKIT, Justice, dissenting.

"The constitution is a law. It is the fundamental, inflexible law in written form which controls, limits, and orders the powers of all departments of government." *Rasmussen v. Baker*, 7 Wyo. 117, 143, 50 P. 819, 826 (1897). Justice Potter's words describe the function of a too often forgotten document, the Wyoming Constitution. In the search for "law," attorneys, legislators, prosecutors and judges seek the shelter of "precedent" where words written before are occasionally venerated, one suspects, merely for their presence on paper.

Today, too often, myopic views of constitutional precedent are limited to those expressed by the United States Supreme Court. Those who participated in the drafting of Wyoming's Constitution, including Justice Potter, would be disappointed to learn of the limited respect we accord their efforts. Our republican form of government remains a government of limited powers given by the people to the state. The protection accorded to the people against the abuse of such power depends on the vitality of the judiciary's protection of constitutional rights. When we permit infringement of constitutional rights, we do not just punish another guilty criminal, we tear at the fabric of our society and diminish the freedom and security of every citizen. I do not believe, under current federal constitutional precedent, that the facts

of this case demonstrate the required "reasonable suspicion" to permit an investigatory stop. Furthermore, I maintain the Wyoming Constitution offers additional protection from such stops. For these reasons, I dissent.[1]

## I. FACTS

The "war on drugs" captured Edward E. Goettl (Goettl) and his companions driving from Buffalo, Wyoming to Sheridan, Wyoming. At the time of the "investigatory stop," officers had the following information upon which to base their "reasonable suspicion." At about 3:45 p.m. on April 28, 1990, the Buffalo Police Department received an anonymous telephone call from a female. The caller told police that Don Goettl's brother had brought LSD up from Colorado and that the brothers and others the informant did not know were getting ready to take the LSD to Sheridan to sell it. The anonymous caller, answering a question from the dispatcher, told police the group was traveling in a Volvo with a Colorado license plate number. The caller gave no indication of the basis of her knowledge.

Using his previous knowledge of the address, Officer Steve Matheson of the Buffalo Police Department drove to Don Goettl's residence and saw a silver Volvo with a license plate number that matched the one the caller used. The officer testified at the suppression hearing that at the time he observed the Volvo, about eight minutes after the anonymous call, no one was around the vehicle, but a passenger door was open. After driving past Don Goettl's home, Officer Matheson positioned himself on the "most likely" route to Sheridan, the north exit of Buffalo, taking Main

---

**1.** Another reason this case should be reversed is the failure of the record on appeal to comply with W.R.A.P. 4.01 (now Rule 3.02(a)). Effective on July 10, 1990, the rule required:

Transcripts in criminal cases shall consist of all proceedings held in open court including but not limited to voir dire, opening statements and final arguments, conferences with the presiding judge in open court and in the court chambers, in addition to the testimony of the case and other required materials.

Edward E. Goettl was tried before a jury in proceedings that commenced on August 14, 1990. The jury voir dire does not appear in the transcript in the record on appeal, despite the designation requesting "the entire transcript" in the Notice of Appeal. Under the rule this court announced in *Bearpaw v. State*, 803 P.2d 70 (Wyo.1990), reversal should occur.

Street to Highway 87 leading to the Interstate. While using a pay telephone at the Frontier Motel to talk with another investigator, Officer Matheson waited for the Volvo to pass. Later, as the Volvo drove by, Officer Matheson reported seeing at least four unidentified people in the car.

At the suppression hearing, Officer Matheson offered his appraisal of the activities he observed:

Q. [By Counsel] * * * Now, between the time that you first went to confirm the description of the vehicle and the time that you saw it heading north out of Buffalo, did you observe anything that you believed to be criminal activity?

A. [By Officer Matheson] No, I did not.

Q. You did not believe when they went by you on the way to Sheridan that you had probable cause to stop the vehicle for the offense?

A. No, I did not.

Q. And you did not believe at that time you had a reasonable suspicion to stop the car; is that correct?

A. No I didn't.

Q. Now, the facts that you observed are facts that could have been observed by anyone, correct?

A. This is correct.

Agent Kevin Hughes of the Wyoming Division of Criminal Investigation, stationed in Sheridan, was informed of the anonymous caller's information. Leaving Sheridan, Agent Hughes alerted local police to stand by for assistance and proceeded toward Buffalo. Agent Hughes spotted the silver Volvo about five miles south of Sheridan. Agent Hughes testified that he could not identify anyone in the vehicle as it passed him since it was snowing at the time and the cars were going opposite directions on the highway. The agent followed the Volvo into Sheridan and ordered Sheridan police to stop the vehicle after it took the Coffeen exit.

Agent Hughes, during cross-examination at the suppression hearing, offered this tortuous "explanation" of his order to stop the car:

Q. [By counsel] Now, you did not witness any attempted sale or delivery of drugs during this entire episode, did you?

A. [By Agent Hughes] Which episode?

Q. The stop of the vehicle from the time Troy Long [another drug investigator] called you until the time that you arrested the occupants in the Volvo?

A. Did I see any attempted delivery of the drugs?

Q. Right.

A. The information was that that's what they were going to Sheridan to do, and I saw the vehicle going to Sheridan.

Q. Let me ask the question again. Did you see any criminal activity during the time between when Troy Long called you and the time that you arrested the five occupants of the silver Volvo?

A. I guess I need to ask you what you mean by did I see any criminal activity.

Q. Did you observe anybody commit a crime?

A. That I knew at the moment that I saw it that it was, in fact, a crime that was being committed?

Q. You've attended a lot of law enforcement training programs, haven't you?

A. Yes, sir

Q. And you understand what I'm trying to find out, don't you?

A. No, sir, I don't.

Q. I'm trying to ask you, did you observe anything that at the time you observed it you thought was a crime?

A. Yes, sir.

Q. What?

A. When the vehicle was, in fact, heading toward Sheridan. Based upon the information we had, I believed a crime was being committed.

The trial court summarized the evidence from the suppression hearing during its ruling from the bench: "As this court sees it, there was the anonymous tip, there were some factors given in that tip which led the officers to believe that they had the right

to stop the car, at least Officer Hughes. He stopped it." Ruling that *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) governed, the trial court found the investigatory stop was justified and the statement Goettl made while in custody was admissible. The trial judge admitted that without *White*, he would have ruled differently. "I personally would have to say that I would not agree with [*White*] and if I were on the Supreme Court I would personally have ruled the other way, but I am not and I have to follow their rule, as I see it."[2]

## II. DISCUSSION

This court, therefore, is presented with a question of constitutional fact. Classified as a mixed question of law and fact, constitutional fact questions demand the application of constitutional principles to the historical facts determined below. *See* Henry P. Monaghan, *Constitutional Fact Review*, 85 Colum.L.Rev. 229 (1985). The historical facts are reviewed under a clearly erroneous standard, *Hyde v. State*, 769 P.2d 376, 378 (Wyo.1989), while the question of whether a violation of constitutional rights occurred is reviewed *de novo*. *See Lopez v. State*, 643 P.2d 682, 683–85 (Wyo.1982); *Cook v. State*, 631 P.2d 5, 7–8 (Wyo.1981); and *Terry v. Ohio*, 392 U.S. 1, 20–23, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968). My analysis begins with federal constitutional principles and moves to a review of Wyoming constitutional law.

## III. FEDERAL CONSTITUTIONAL PRINCIPLES

Adopting a rule of selective incorporation, the United States Supreme Court has held that various portions of the first eight provisions of the Bill of Rights are applicable to the states through the due process clause of the Fourteenth Amendment. *See* Laurence H. Tribe, *American Constitutional Law* § 11–2 (2d ed. 1988). In *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), the United States Supreme Court held the Fourth Amendment's rights to be free of unreasonable search and seizure applied to the states. The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The federal sanction of excluding from criminal proceedings improperly seized evidence was extended to the states in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Incorporation has therefore created a minimum level of constitutional protection from which the states are free to extend greater protection. *Cheyenne Airport Bd. v. Rogers*, 707 P.2d 717, 726 (Wyo.1985); *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 81, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980).

The evolving history of investigatory stops reveals, however, that the federal "minimum" fluctuates with the changing makeup of the United States Supreme Court. In the most recent example, the facts of *White* disclose the Montgomery, Alabama police department received an anonymous telephone call from a person

---

**2.** A considerable suspicion is cynically created from consideration of the large number of *Terry* stop cases that the logical concept applied is to find that the originating information must have been valid since authenticated after the stop by the determined possession of contraband. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Relevant or not in post-fact justification within the many cases, that situation did not occur here. No contraband was found on the person of Goettl or otherwise in his possession in the vehicle. His subsequent arrest was actually justified by the stopping and arresting officer's action in establishing that Goettl's driver's license had expired. Consequently, the tipster's report about his personal possession and intended delivery was categorically untrue. What did happen was that an unrelated passenger also permitted a personal search by the officer and was himself discovered to possess controlled substances in his possession.

Additionally, a real question about denied access to legal representation after the driver's license arrest was clearly presented in the conflict in the suppression hearing testimony.

who said Vanessa White would leave a particular apartment at a particular time in a brown Plymouth station wagon with the right taillight lens broken. White, according to the anonymous caller would travel to Dobey's Motel with about an ounce of cocaine inside a brown attache' case. When two police officers arrived at the apartment, they saw a brown Plymouth station wagon with a broken right taillight parked in front of a lot at the apartment building the anonymous caller named. Later, officers saw a then unidentified female leave the apartment building, but without an attache' case, and enter the station wagon. The officers followed as the driver took the "most direct route to Dobey's Motel." *White,* 496 U.S. at 325, 110 S.Ct. at 2414. Police stopped the car "just short of Dobey's Motel" and informed the driver she had been stopped because she was suspected of carrying cocaine in her car. *Id.* With White's consent, officers searched the car and found a brown attache case which contained marijuana. Later, after police arrested White, three milligrams of cocaine were found in her purse.

The issue before the court was "whether the tip, as corroborated by independent police work, exhibited sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *Id.* 496 U.S. at 327, at 2414. Applying a "totality of the circumstances" test, *Illinois v. Gates,* 462 U.S. 213, 225, 103 S.Ct. 2317, 2325, 76 L.Ed.2d 527 (1983), the United States Supreme Court first determined that the anonymous caller's information provided " 'virtually nothing from which one might conclude that [the caller] is either honest or his information reliable; likewise, the [tip] gives absolutely no indication of the basis for the [caller's] predictions regarding [Vanessa White's] criminal activities.' " *White,* 496 U.S. at 329, 110 S.Ct. at 2415 (*quoting Gates,* 462 U.S. at 227, 103 S.Ct. at 2326). The United States Supreme Court next determined that police corroboration of the anonymous caller's information was required. The degree of corroboration was determined by the "reasonable suspicion" standard which the majority described as "less demanding" than probable

cause. *White,* 496 U.S. at 329–31, 110 S.Ct. at 2416. Critical to the outcome of *White* is the amount of information required. The United States Supreme Court pointed to a balancing framework in which "if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *Id.*

The *White* majority noted that Montgomery police corroborated that a woman left the particular apartment building the anonymous caller mentioned, although not the particular apartment. The woman did get into the particular vehicle the caller described. The woman left the building within the time frame predicted by the anonymous caller. While police stopped White before she reached Dobey's Motel, the majority found White's use of the most direct route significantly corroborated the anonymous caller's prediction of destination.

For the majority, the most important details in the anonymous caller's information were those predicting White's future activities:

What was important was the caller's ability to predict respondent's *future behavior,* because it demonstrated inside information—a special familiarity with respondent's affairs. The general public would have had no way of knowing that respondent would shortly leave the building, get in the described car, and drive the most direct route to Dobey's Motel. Because only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about the individual's illegal activities.

*Id.* 496 U.S. at 332, 110 S.Ct. at 2417 (emphasis in original). Calling it a "close case," the majority held that "under the totality of the circumstances the anonymous tip, as corroborated, exhibited sufficient indicia of reliability to justify the investigatory stop of [White's] car." *Id.*

Justice Stevens, writing for the three dissenting members of the United States

Supreme Court in *White*, pointed to the "mockery" the majority had made of constitutional search and seizure protection. *White*, 496 U.S. at 333, 110 S.Ct. at 2418, Stevens, J. dissenting. "Anybody with enough knowledge about a given person to make her the target of a prank, or to harbor a grudge against her, will certainly be able to formulate a tip about her like the one predicting Vanessa White's excursion." *Id.* Noting the potential for abuse, Justice Stevens expressed his view that "every citizen is subject to being seized and questioned by any officer who is prepared to testify that the warrantless stop was based on an anonymous tip predicting whatever conduct the officer just observed." *Id.*

*White's* pedigree traces to 1968 when the United States Supreme Court first approved a "stop and frisk" and began the federal constitutional history of investigatory stops using a carefully balanced approach. Thus came into the law what has since been explained as the *Terry* stop. In *Terry*, a plain clothes police detective, with thirty-nine years experience, saw two men individually and repeatedly "peering" in a store window. *Terry*, 392 U.S. at 6, 88 S.Ct. at 1872. After a third man briefly met twice with the others, the detective, suspecting that the men were "casing a job, a stick-up," approached the group to ask about their activities. *Id.* at 6, 88 S.Ct. at 1872. Fearing they might be armed, the detective "patted down" Terry and felt what he suspected was a gun. *Id.* at 7, 88 S.Ct. at 1872. Terry was armed with a .38 caliber revolver which he attempted to suppress at trial.

The *Terry* court considered whether an unreasonable search and seizure had occurred. The United States Supreme Court said there was no question that a "seizure" occurred and that Terry was "searched." *Id.* at 19, 88 S.Ct. at 1878–79. The dual analysis inquired "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20, 88 S.Ct. at 1879. To justify the intrusion, the "officer must be able to point to *specific and articulable facts* which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880 (emphasis added). The reasonableness of the actions should then be evaluated using "an objective standard: would the facts available to the officer *at the moment of the seizure* or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id.* at 21–22, 88 S.Ct. at 1880 (emphasis added).

Balancing the governmental interest in preventing crime, against the expectation of privacy involved, the United States Supreme Court held the activities of the men were suspicious enough to justify the detective's approach and temporary seizure. Specifically, the United States Supreme Court noted that the detective observed the men walk in front of the store window approximately twenty-four times. The weapons search was also justified based on the officer's need for protection tested by whether a "reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27, 88 S.Ct. at 1883. The United States Supreme Court specifically limited its holding:

> We merely hold today that where a police officer observes *unusual conduct* which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Id.* at 30, 88 S.Ct. at 1884–85 (emphasis added).

Four years after *Terry*, the United States Supreme Court applied its holding in *Adams v. Williams*, 407 U.S. 143, 92 S.Ct.

1921, 32 L.Ed.2d 612 (1972). Robert Williams was stopped after a known informant told a patrol officer that an individual parked nearby was carrying narcotics and had a gun at his waist. When the officer approached the car, he asked Williams to open the door. Instead, Williams rolled down the window prompting the officer to reach into the car and pull a loaded revolver from Williams' waistband. A search incident to Williams' arrest discovered large quantities of heroin and other weapons. In upholding the validity of the officer's actions, the United States Supreme Court explained that the purpose of the limited *Terry* search "is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence * * *." *Id.* at 146, 92 S.Ct. at 1923. The officer was justified in responding to the informant's tip because the officer knew the informant and the informant had provided information in the past. "This is a stronger case than obtains in the case of an anonymous telephone tip." The majority cautioned, that "while the Court's decisions indicate that this informant's unverified tip may have been insufficient for a narcotics arrest or search warrant * * *, the information carried enough indicia of reliability to justify the officer's forcible stop of Williams." *Id.* at 147, 92 S.Ct. at 1924.

The dissenting justices in *Williams* wisely expressed their concern that *Terry* was being improvidently broadened. Justice Marshall noted in his dissent that *Terry* stands for the limited proposition that, without a warrant, police have a " 'narrowly drawn authority to ... search for weapons' * * *." *Williams*, 407 U.S. at 154, 92 S.Ct. at 1927 (*quoting Terry*, 392 U.S. at 27, 88 S.Ct. at 1883). Justices Douglas and Brennan both expressed their agreement with Judge Friendly's position during a previous proceeding in the United States Court of Appeals for the Second Circuit. *Williams*, 407 U.S. at 149–53, 92 S.Ct. at 1924–27, Douglas, J., dissenting and Brennan, J., dissenting. Judge Friendly wrote that he had the "gravest hesitancy" about extending *Terry* to crimes such as possession of narcotics because of the danger

that "instead of the stop being the object and the protective frisk an incident thereto, the reverse will be true." *Williams v. Adams*, 436 F.2d 30, 38 (2nd Cir.1970), Friendly, Cir.J., dissenting, *cert. granted* 404 U.S. 1014, 92 S.Ct. 670, 30 L.Ed.2d 661 *judgment reversed* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Judge Friendly also called into question the existence of the informer by pointing out that at an initial suppression hearing, the officer claimed to be responding to a police signal. At a subsequent hearing, the "informer appeared and the signal disappeared." *Id.* at 36 n. 4.

Nearly ten years after *Terry*, the United States Supreme Court held that after stopping a vehicle for a traffic violation, officers, again in the interests of personal safety, may order the driver to get out of the vehicle without violating the search and seizure protection. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n. 6, 98 S.Ct. 330, 333 n. 6, 54 L.Ed.2d 331 (1977).

In *United States v. Cortez*, 449 U.S. 411, 413–14, 101 S.Ct. 690, 692–93, 66 L.Ed.2d 621 (1981), *cert. denied* 455 U.S. 923, 102 S.Ct. 1281, 71 L.Ed.2d 464 (1982), border patrol agents investigated patterns of footprints in the Arizona desert and deduced that groups of illegal aliens were being smuggled into this country. After determining a probable pattern to the operation, the agents positioned themselves at a vantage point where they could observe vehicles passing on a highway that was being used as a pick-up point. When a distinctive truck with a camper shell passed by twice, officers stopped it and discovered six illegal aliens. The United States Supreme Court stated the test, based on the totality of the circumstances, that "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* at 417–18, 101 S.Ct. at 695. Holding that the experienced officers could "reasonably surmise" the occupants of the particular vehicle they stopped were engaged in criminal activity, the United States Supreme Court concluded the stop did not violate federal

search and seizure protection. *Id.* at 421–22, 101 S.Ct. at 696–97.

*Gates,* 462 U.S. at 225, 103 S.Ct. at 2325, is technically not a *Terry* stop case since it deals with probable cause determinations for a search warrant. However, *Gates* plays a critical role in defining the verification required in *White.* In *Gates,* an anonymous letter was sent to Bloomingdale, Illinois police. The letter claimed Susan and Lance Gates were selling illegal drugs and a Florida trip was planned to transport a new shipment. Police confirmed the travel plans outlined in the letter, and confirmed Lance Gates' arrival in Florida and subsequent departure for Illinois. When Gates and his wife returned to their home, police conducted a warranted search and found 350 pounds of marijuana in their car along with more marijuana, weapons and other contraband in their home. The Illinois court ordered the evidence suppressed finding that the letter did not provide a basis for probable cause to issue a search warrant.

The United States Supreme Court reversed, holding that the "two-pronged test" derived from *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) and *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) (hereinafter *Aguilar–Spinelli* test) had been too rigidly applied making it unlikely that anonymous tips could be used to support probable cause determinations. *Gates,* 462 U.S. at 237–38, 103 S.Ct. at 2331–32. Instead, the United States Supreme Court directed magistrates make probable cause determinations on a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238, 103 S.Ct. at 2332. The majority conceded the importance of the "value of corroboration of details of an informant's tip by independent police work." *Id.* at 241, 103 S.Ct. at 2334. The United States Supreme Court also noted that the anonymous letter "contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to *future actions* of third parties ordinarily not easily predicted." *Id.* at 245, 103 S.Ct. at 2335–36 (emphasis added).

The immediate predecessor of *White* was *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Andrew Sokolow was stopped at the airport after returning to Honolulu from Miami. An airline ticket agent had alerted police that a young man wearing gold jewelry had purchased tickets with cash. At the time drug enforcement agents stopped Sokolow, the agents knew: Sokolow had paid $2,100 for two airline tickets from a roll of $20 bills; he had traveled under a different name from the name used in his telephone listing; he traveled to Miami, a city known for illicit drugs; he stayed in Miami only forty-eight hours even though the round trip from Honolulu to Miami requires twenty hours; he was nervous during the trip and at stopovers; and no luggage was checked although Sokolow and his traveling companion carried four bags. *Id.* 490 U.S. at 2–4, 109 S.Ct. at 1583. Sokolow was found to be carrying cocaine and, after suppression, was denied entered a conditional plea of guilty. The United States Court of Appeals for the Ninth Circuit found reasonable suspicion was not demonstrated under a two-part test it formulated which considered facts describing "ongoing criminal activity" separately from facts which described "personal characteristics."

The United States Supreme Court's analysis began by noting that the level of suspicion necessary for an investigatory stop is "obviously less demanding than that for probable cause." *Id.* 490 U.S. at 7, 109 S.Ct. at 1585. Dismissing the Ninth Circuit's two-part test, the United States Supreme Court used the "totality of the circumstances" approach to consider the "probabilities" that the facts known to the drug agents disclosed a "reasonable suspicion" of criminal activity sufficient to stop Sokolow. *Id.* 490 U.S. at 6–9, 109 S.Ct. at 1585–86. The United States Supreme Court then extended language from *Gates* to apply to reasonable suspicion determina-

tions: " 'innocent behavior will frequently provide the basis for a showing of probable cause,' and that '[i]n making a determination of probable cause the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts.' " *Sokolow,* 490 U.S. at 10, 109 S.Ct. at 1587 (*quoting Gates,* 462 U.S. at 243–44 n. 13, 103 S.Ct. at 2335 n. 13).

The majority held agents had a reasonable suspicion of criminal activity when they stopped Sokolow. *Sokolow,* 490 U.S. at 10–11, 109 S.Ct. at 1587. The United States Supreme Court acknowledged that any one of the bits of information known to agents would not, by itself, prove illegal conduct and could be "quite consistent with innocent travel." *Id.* 490 U.S. at 9, 109 S.Ct. at 1586. For example, the United States Supreme Court speculated that a person traveling under an alias may do so wishing to conceal travel to a hospital for an operation. On the other hand, the United States Supreme Court claimed that paying for airline tickets with cash was unusual: "Most business travelers, we feel confident, purchase airline tickets by credit card or check so as to have a record for tax or business purposes, and few vacationers carry with them thousands of dollars in $20 bills." *Id.* 490 U.S. at 8–9, 109 S.Ct. at 1586. The short stay in Miami drew the majority's attention: "surely few residents of Honolulu travel from that city for 20 hours to spend 48 hours in Miami during the month of July." *Id.*

There is no emerging constitutional rule to be simply applied from this series of case-by-case inquiries because each is limited to its facts. *Sokolow,* 490 U.S. at 17–18, 109 S.Ct. at 1591, Marshall, J., dissenting. However, the balanced framework of *Terry* with its attention to "unusual conduct" observed by a police officer has been severely mutated by the United States Supreme Court. The limited weapons search, the "frisk" of *Terry's* "stop and frisk," is perhaps forgotten, if not lost, by the willingness to broaden investigatory stops to evidence searches. Law enforcement officers, faced with the task of deciding under diffi-cult field conditions whether reasonable suspicion exists, may choose to ponder what is permissible. The options appear to direct *post hoc* justifications which can be made to conform to the facts of a prior "safe" case or to risk losing a "bust."

## IV. STATE APPLICATION OF FEDERAL PRINCIPLES

In the context of investigatory stops based upon anonymous informant's tips, a survey of state cases applying *White* reveals attempts are being made to preserve the "unusual conduct" dimension of investigatory stops while providing law enforcement with reasoned guidance on the level of corroboration necessary to create an indicia of reliability for anonymous tips. State courts seek to distinguish the degree of detail the informant must provide or the informant's ability to predict future behavior. Certainly, the indeterminate views taken of what constitutes "future behavior" makes any prediction, or in this context probability estimates, hazardous. Many cases attempt to examine the observed behavior. A few examples teach us of the infirmity of *White* while providing vivid evidence of the difficulty facing law enforcement in determining whether they truly have the "indicia of reliability" necessary to support a "reasonable suspicion."

The Supreme Judicial Court of Massachusetts specifically declined to follow the "totality of the circumstances" test in considering whether officers had reasonable suspicion to stop a car. An anonymous caller's information claimed that a man named "Wayne" bought drugs in Chelsea, Massachusetts and would be driving a silver Hyundai with a Maine license number to Bridgton, Maine. *Com. v. Lyons,* 409 Mass. 16, 564 N.E.2d 390, 391 (1990). The Massachusetts's justices described the United States Supreme Court approach as lacking the precision necessary in stating a test for probable cause. The court held that an investigatory automobile stop requires proof the officer developed reasonable suspicion that the occupants committed, or are committing, or are about to commit a crime. Because the anonymous

caller's information failed to provide any information on the basis of the informant's knowledge or the informant's reliability and because the details corroborated by the police were insufficient, the court decided reasonable suspicion was not demonstrated. The court found the officers verified only the description of the car, the direction of travel and the race and gender of the occupants before making their stop. The court found the corroboration of "obvious details" did not justify the investigatory stop. *See also Com. v. Bakoian*, 412 Mass. 295, 588 N.E.2d 667 (1992) (holding a known informant's tip distinguishable from *Lyons* because specific non-obvious details were provided) and *Rojas v. State*, 797 S.W.2d 41, 44 (Tex.Cr.App.1990) (holding for probable cause to search, anonymous informer must assert personal knowledge or additional facts must provide a showing that contraband will probably be located).

In *People v. Faucett*, 193 Mich.App. 499, 484 N.W.2d 670, 672 (1992), the court held that activities predicted by an anonymous telephone caller "were so lacking in significance and particular detail that their fruition did not give rise to a reasonable suspicion of criminal activity." The anonymous caller told a dispatcher that a newer blue pickup, possibly a Datsun, was traveling to a Michigan town with cocaine or marijuana. The caller reported that the vehicle was driven by a specific individual and the drugs were located in a carrying case behind a seat. The direction of travel along a specific series of streets was given. Police, searching the route, located a blue Mazda pickup and a license plate check confirmed that the identity of the owner matched the name given by the anonymous caller. The court said more than a vehicle description and a general direction of travel was required for reasonable suspicion. *See Lambert v. State*, 34 Ark.App. 227, 808 S.W.2d 788 (1991) (holding an anonymous caller's tip that an individual driving a specific truck leaving one city at a specific time driving to another city with marijuana did not provide reasonable suspicion when the officer matched only the truck description on route and approximate time) and *Hardy v. Com.*, 11 Va.App. 433, 399 S.E.2d 27

(1990) (holding an officer's corroboration of only "innocent details" from an anonymous caller's tip was insufficient).

The Court of Criminal Appeals of Texas, in an *en banc* decision, held "the suspicious conduct relied upon by law enforcement officers must be sufficiently distinguishable from that of innocent people under the same circumstances as to clearly, if not conclusively, set the suspect apart from them." *Crockett v. State*, 803 S.W.2d 308, 311 (Tex.Cr.App.1991). In *Crockett*, the court found the behavior of the suspects in a train station, including paying cash for tickets, "scoping" the lobby, not talking much and walking separately may have seemed "odd" to police but it was not sufficiently indicative of drug trafficking to justify an investigative stop. *Id.* at 310, 313.

A concerned New Mexico Court of Appeals concluded that officers lacking reasonable suspicion for an investigatory stop and lacking probable cause for a search improperly seized a man in hopes of obtaining a consent to search or developing probable cause. *State v. Bedolla*, 111 N.M. 448, 452, 806 P.2d 588, 592, *cert. denied* 111 N.M. 416, 806 P.2d 65 (1991). Police received an anonymous call that a man named "Frank" and another man, with a purple Nissan pickup with California license plates, were distributing cocaine from a motel room. After observing the motel for over an hour and seeing no evidence of criminal activity, police stopped the vehicle shortly after it left the parking area. The police corroboration "yielded nothing consistent with criminal behavior * * *" and corroborated only the existence of the vehicle, its license, and it was driven by an unidentified individual. *Id.* 111 N.M. at 451, 806 P.2d at 591. With no signs that a crime was being committed or was about to be committed, the court concluded that the only purpose of the stop was to investigate the anonymous caller's information; therefore, the illegal stop tainted the consent to search.

In *Cunningham v. State*, 591 So.2d 1058, 1061 (Fla.App.1991) (emphasis in original), Florida drew a line distinguishing between the degree of corroboration required

for a stop and that required for a search or arrest:

> It is not sufficient merely to corroborate the anonymous information concerning the identity, dress, description, location or even future activity of the suspect who is the subject of the anonymous information. In addition to independent evidence verifying that type of information, there must also be independent evidence of criminal activity on the part of the suspect. Otherwise, any totally innocent person could be the object of an anonymous tip furnishing verifiable information about name, description, whereabouts and future activity. When that type of verifiable information is furnished together with unverifiable allegations of criminal activity, a detention *and* search of a person so anonymously informed against is not authorized.

The court said it acted from a "growing concern" that even after the anonymous caller's information is sufficiently corroborated to justify a stop, the search or arrest is not authorized absent "the discovery of evidence sufficient to establish in the mind of the detaining officer probable cause to believe that the detainee is engaged in criminal activity * * *." *Id.* at 1060. *See also Sapp v. State*, 592 So.2d 786 (Fla.App. 1992) (holding officers lacked reasonable suspicion for an investigatory stop when an anonymous caller gave only details of identification and location and officers made no independent observations supporting probable cause to believe any criminal activity was taking place) and *Swanson v. State*, 591 So.2d 1114, 1116 (Fla.App.1992) (holding police corroborated only "easily obtained facts and conditions presumably existing at the time * * *" of the anonymous informant's call).

The concern of state courts that innocent conduct not be used to justify an investigatory stop is highlighted by a recent New Hampshire Supreme Court decision. In *State v. Kennison*, 134 N.H. 243, 590 A.2d 1099, 1100 (1991), an anonymous caller told police that Gina Kennison had four pounds of marijuana in the trunk of her car. The caller said Kennison drove a blue Cadillac and gave her license number. According

to the caller, Kennison would leave her work place in Nashua, New Hampshire at 3:00 p.m. to travel to Hudson, New Hampshire where, after going to her home, she would be making marijuana deliveries. Police confirmed that the Cadillac was parked at Kennison's work place in Nashua and that a woman departed in the car at 3:00 p.m. Another officer, who knew Kennison, witnessed her arrive home, park her car and enter her house. *Id.* After about two hours, she left her home in the Cadillac. The officer followed for less than a mile before he "pulled her over." *Id.* No suspicious or illegal activity had been observed.

Deciding the case under provisions of the New Hampshire Constitution, the court held the police "lacked reasonable suspicion" and "unjustifiably intruded upon Kennison's protected privacy interests." *Id.* 590 A.2d at 1102. First, with no "track record" of previously accurate information to point to, the anonymous informant lacked reliability. *Id.* at 1101. Second, minimal information existed showing the informant's basis of knowledge. Third, the information about the car, license number, place of employment and departure time was readily available. The "predictions" that Kennison would leave Nashua, drive to Hudson and then leave home again did not show a special familiarity with Kennison's affairs. Fourth, the police corroborated "mundane, innocent facts easily available to co-workers or friends, or to persons who might wish to harass or embarrass another." *Id.* Fifth, officers observed no suspicious or incriminating activity during the surveillance. Sixth, the anonymous caller's information lacked the "wealth of intimate detail" necessary to make it self-verifying, such as Kennison's description, her home address, the names or addresses of persons she would see during the evening, or the method of drug distribution. *Id.* at 1102.

## V. FEDERAL PRINCIPLES PROPERLY APPLIED

Under *White*, 496 U.S. 325, 110 S.Ct. 2412, and federal constitutional principles, the question remains of whether the anony-

mous caller's information together with Goettl's conduct created reasonable suspicion justifying Agent Hughes' decision to order the investigatory stop. While the majority concluded such suspicion existed based on the anonymous caller's prediction of future events, a review of the evidence from the suppression hearing is in order.

Initially, we should attempt to clarify what "future events" the anonymous caller predicted and what the police really corroborated. The caller said Don Goettl and his brother and others were *getting ready to go* to Sheridan in a silver Volvo with a Colorado license number. Apparently, the anonymous caller did not give police Don Goettl's address, since Officer Matheson testified he used his previous knowledge of the address to drive to the neighborhood. Officer Matheson corroborated the existence of the silver Volvo and the license plate number, but ignored by the majority was his testimony that he observed an open car door. A reasonable inference from seeing an open car door in a residential neighborhood on a Saturday is that the residents are packing for a trip. They were, in fact, *getting ready to go.* There is no future prediction in this information. The officer's observations only confirm what every neighbor could have reported from a vantage point anywhere along the block. Officer Matheson's testimony indicated he did not believe a reasonable suspicion for a stop existed from the activities he observed.

The only remaining future prediction is that the occupants of the Volvo would travel to Sheridan. But a neighbor observing the car being packed could also infer that a trip to a nearby larger town was in order. Without alerting any suspicion in a typical Wyoming town, a neighbor, acquaintance or passing stranger could easily inquire, "Where are you headed?" Even if we assume an element of future prediction in the anonymous caller's report that Sheridan was the destination, does that fact justify a reasonable suspicion for an investigatory stop? I would argue that *White* teaches it does not and the principles stated in the previously discussed cases applying *White* agree. *See, e.g., Lyons,* 564 N.E.2d at 393;

*Faucett,* 484 N.W.2d 670; *Kennison,* 590 A.2d at 1102; *Bedolla,* 111 N.M. at 451, 806 P.2d at 591; and *Crockett,* 803 S.W.2d at 313.

Applying a totality of the circumstances test to ask whether the tip, as corroborated, "exhibited sufficient indicia of reliability to provide reasonable suspicion * * *" justifying an investigatory stop, *White,* 496 U.S. at 327, 110 S.Ct. at 2414, I believe we see only an attempt on Agent Hughes' part to offer conforming testimony. The caller's veracity is as unknown as her identity. No evidence of past reliability is presented. The caller's basis of knowledge is undisclosed. The record before this court does *not indicate whether the anonymous caller would be able to identify LSD; whether she actually saw the drugs; whether she saw the drugs in the possession of Goettl; whether she witnessed Goettl arranging to sell drugs; or whether she actually witnessed Goettl sell drugs.* In *White,* the United States Supreme Court directed that despite the demise of the *Aguilar–Spinelli* test, the factors of veracity, reliability and basis of knowledge "remain 'highly relevant in determining the value of [the anonymous caller's] report.'" *White,* 496 U.S. at 328, 110 S.Ct. at 2415 (*quoting Gates,* 462 U.S. at 230, 103 S.Ct. at 2328). Therefore, since the anonymous caller's information has a relatively low degree of reliability, police were under an obligation to establish *more information* to provide reasonable suspicion. *White,* 496 U.S. 110 S.Ct. at 2416.

The consideration of the totality of the circumstances demands that both the "quantity and quality" of information possessed by the police by considered. *Id.* The quantity of the information the anonymous caller revealed about Goettl was minimal, providing little assurance of veracity, and could be easily observed. For example, in *White,* the caller described the specific apartment, the specific vehicle and the location of drugs in a brown attache' case. The anonymous caller here did not name all the individuals involved, apparently only identified the car after being questioned by the police dispatcher who took the call and

never stated what quantity of drugs would be involved nor where they would be located. This discloses a lack of special familiarity with Goettl's affairs.

Critically absent from the anonymous caller's information was any particularized information, the quality component, about Goettl's planned activities in Sheridan. In *White*, the anonymous caller specifically indicated Vanessa White's destination would be Dobey's Motel. *White*, 496 U.S. at 325–27, 110 S.Ct. at 2414. Who was Goettl going to meet? What quantity of drugs would be involved in the sale or would there be multiple sales? When was Goettl going to sell the drugs? Where in Sheridan was Goettl going to stop? How would the transaction be conducted? Simple questions regarding possible criminal activity which would support veracity and a basis of knowledge, but the anonymous caller provided no details and the police had no answers. Goettl could have pulled off the interstate for a rest stop in route to another city at the request of one of his passengers, but as far as Agent Hughes was concerned, that was all he needed to have reasonable suspicion that the anonymous caller's information exhibited a significant indicia of reliability to justify an investigatory stop.

I would hold, under federal constitutional principles, that the officers lacked reasonable suspicion to make an investigatory stop, under *White*, and the improper stop tainted the subsequent consensual search and the confession requiring suppression. *Bedolla*, 111 N.M. at 456, 806 P.2d at 596. The anonymous caller's information and the limited investigation by officers did not provide sufficient indicia of reliability. The plain fact is that no criminal activity was observed. The actions that were observed did not support an "objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *Cortez*, 449 U.S. at 417, 101 S.Ct. at 695. The officers' "good faith" in their actions is not enough. *Terry*, 392 U.S. at 22, 88 S.Ct. at 1880–81. The stop represented an unreasonable intrusion into Fourth Amendment rights.

## VI. WYOMING CONSTITUTIONAL PRINCIPLES

The infirmity of today's decision and of *White* is that police and courts are left to speculate on behavioral motives. I contend a court of law should not be reduced to rendering justice based upon the judge's ability to state "probabilities" of normative spending patterns, travel destinations, driving behavior and other characteristics. The concept of a rule of law seeks to avoid the whims of an individual police officer or an individual judge being imposed upon the people who established the government. I further believe the American judiciary best serves the people when we are able to provide something more than conforming facts which an officer may use to consider the appropriateness of his actions. Therefore, to provide guidance to the law enforcement officers of Wyoming, this court should look to the Wyoming Constitution for applicable standards of search and seizure protection. *See* Robert B. Keiter, *An Essay on Wyoming Constitutional Interpretation*, 21 Land and Water L.Rev. 527 (1986) (arguing the Wyoming Supreme Court should search for an independent meaning of provisions of state constitution rather than borrowing from federal precedent).

Providing more protection for individual rights under the language of the Wyoming Constitution is not a unique proposition. Beside those cases we have already examined, *see, e.g.*, *Kennison*, 590 A.2d at 1102, other jurisdictions have accorded more expansive protection of individual liberty under their state constitutions. In *State v. Jones*, 706 P.2d 317, 324 (Alaska 1985), the Supreme Court of Alaska recognized that the *Gates* totality of the circumstances test "does not provide the constitutional protection against unreasonable searches and seizures required by * * * the Alaska Constitution." The court accurately described the value of federal decisions: "[W]e rely on federal precedents to interpret the requirements of the Alaska Constitution as we would rely on the precedents of other jurisdictions." *Id.* at 324 n. 7. The court continued to utilize the *Aguilar–Spinelli*

test for probable cause determinations based on information from confidential informants. *See also State v. Cordova,* 109 N.M. 211, 217, 784 P.2d 30, 36 (1989) (holding the *Aguilar–Spinelli* test more accurately reflects state constitutional requirements); *People v. Griminger,* 71 N.Y.2d 635, 529 N.Y.S.2d 55, 524 N.E.2d 409 (1988) (holding as a matter of state constitutional law, that the *Aguilar–Spinelli* test will be applied instead of totality of the circumstances); *State v. Jacumin,* 778 S.W.2d 430, 436 (Tenn.1989) (holding the *Aguilar–Spinelli* test is more in keeping with specific provisions of state constitution); and *State v. Jackson,* 102 Wash.2d 432, 688 P.2d 136, 143 (1984) (state constitution requires affidavit disclosing informant's credibility and reliability tested under the *Aguilar–Spinelli* analysis).

Wyoming's Constitution assures:

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause, supported by affidavit, particularly describing the place to be searched or the person or thing to be seized.

Wyo. Const. art. 1, § 4. Despite the majority's hasty dismissal of the linguistic differences between the Fourth Amendment and Wyoming's search and seizure provision, this court has previously held those differences to be significant.

Wyoming, as a territory, was governed by the Constitution and laws of the United States, including the Fourth Amendment, from 1868 to July 10, 1890. Organic Act § 16, 15 Stat. at Large 178, ch. 235 (1868). The preparation of a state constitution, and the Congressional acceptance, ratification and confirmation of that document as part of the process of statehood, limited Fourth Amendment protection to federal action. Act of Admission § 1, 26 Stat. at Large 222, ch. 664 (1890). The majority fails to recognize that prior to the selective incorporation of Fourth Amendment principles announced by *Wolf,* 338 U.S. 25, 69 S.Ct. 1359, in 1949, the only protection against unreasonable searches and seizures by state officials between 1890 and 1949 was provided by the Wyoming Constitution. Therefore, decisions of that era offer special guidance into the protection accorded the citizens of Wyoming by our state constitution.

The first major decision to consider the intent of the Wyoming Constitution was *Rasmussen,* 7 Wyo. 117, 50 P. 819. Justice Potter, writing for the court, brought a special insight to his decision since he had participated in the drafting of the document as a member of the Constitutional Convention. *See Journal and Debates of the Constitutional Convention of the State of Wyoming* (1893). Interpreting a voting rights provision, Justice Potter wrote that the "primary principle underlying an interpretation of constitutions or statutes is that the intent is the vital part, and the essence of the law." *Rasmussen,* 7 Wyo. at 128, 50 P. at 821. In constitutional construction, it must be presumed that the people "intended whatever has been plainly expressed." *Id.* A presumption attaches that "language has been employed with sufficient precision to convey the intent." *Id.* at 130, 50 P. at 822. "The constitution derives its force from the people who adopted it, and it is the intention of the people which is to be sought for." *Id.* at 131, 50 P. at 822. Perhaps Justice Potter's most lasting caution is that the debates of the constitutional convention "are not a very reliable source of information upon the subject of the construction of any particular word or provision * * *." *Id.* at 138, 50 P. at 824.

*State v. Peterson,* 27 Wyo. 185, 194 P. 342 (1920) presented the first occasion for the Wyoming Supreme Court to directly consider the intent of Wyo. Const. art. 1, § 4 and to compare its protection against those of the Fourth Amendment. The issue was the propriety of search warrants issued for that illegal substance of the prohibition era, alcohol. The court noted that the protection against unreasonable search and seizure was adopted in the Fourth Amendment and "appears in all state constitutions in slightly varying language." *Id.* at 197, 194 P. at 345. Instead of dismissing the linguistic differences between

Wyo. Const. art. 1, § 4 and the Fourth Amendment, the court termed the Wyoming Constitution as "some stronger" because Wyoming required a written affidavit to support probable cause determinations. *Id.* at 198, 194 P. at 345. The division of authority between the Wyoming and the federal constitutions was plainly stated. The Fourth Amendment "has been held to operate solely on the Federal Government, its courts and officers, and not as a limitation upon the powers of the states." *Id.* at 213, 194 P. at 350. The Wyoming legislature, courts and executive officers are limited by provisions of the state constitution. Under this authority, the court concluded a prohibition law was unconstitutional because probable cause determinations must be made by a judge or magistrate and cannot be deferred to a prosecutor by legislative authorization. Additionally, the court held, as a matter of constitutional law, a probable cause determination cannot occur based on the affiant's "information and belief;" rather, facts showing knowledge of criminal conduct is required. *See also Wiggin v. State*, 28 Wyo. 480, 206 P. 373 (1922) (holding affidavit on "information and belief" invalid to secure warrant and adopting exclusionary rule in Wyoming for illegally obtained evidence) and *State v. Boulter*, 5 Wyo. 236, 39 P. 883 (1895) (holding affidavit on "information and belief" invalid).

In *State v. George*, 32 Wyo. 223, 245, 231 P. 683, 689 (1924), this court cautioned law enforcement: "The mere discovery of evidence of a crime pursuant to a search will not validate a search, or make lawful an arrest that would otherwise be unlawful." Adopting the view that the reasonableness of a search or seizure is a judicial question, the court said the determination is made "from all the circumstances of a case." *Id.* at 239, 231 P. at 687. *See State v. Hiteshew*, 42 Wyo. 147, 154–55, 292 P. 2 (1930) (holding general principles of comity permit evidence obtained from search valid under federal law to be used in state court). In *George*, 32 Wyo. at 242–43, 231 P. at 688–89, Wyoming adopted the "open fields" doctrine.

*Tobin v. State*, 36 Wyo. 368, 373, 255 P. 788, 789 (1927) recognized that voluntary consent to permit a search must "appear by clear and positive testimony, and if the search and seizure are based upon the proposition that consent was given to the officers, there should be no question about it in the evidence submitted." Peaceful submission to the officer does not constitute a waiver of constitutional rights or consent. The court reversed a gambling conviction because sheriff's officers had conducted a search without a warrant and the consent of a doorkeeper was insufficient. *See also State v. Bonolo*, 39 Wyo. 299, 305, 270 P. 1065, 1066–67 (1928) (holding testimony showed either acquiescence or non-resistance to search, not consent).

The facts of *State v. Kelly*, 38 Wyo. 455, 268 P. 571 (1928) provide a useful comparison under the Wyoming Constitution for our present issues. *Kelly* is the first Wyoming case to consider the validity of an automobile search and the subsequent seizure of the owner and a passenger based upon a telephone tip from a known informant. The Sheriff of Washakie County, Wyoming claimed to receive a telephone call from a Deputy Sheriff of Hot Springs County, Wyoming indicating that two men would be driving through the town of Worland, Wyoming with a car carrying illegal liquor. The driver was described as a "fat, heavy-set man * * *" and the passenger as a "small man." *Id.* at 457, 268 P. at 571. A partial description of the automobile was also provided. The Sheriff visited two Worland area garages looking for the car. At the Worland Garage, the Sheriff saw two men matching the description who seemed "agitated" when they noticed the Sheriff. An open car of that era, with no side curtains, had been driven into the garage area by a boy. As the Sheriff walked past the car, he noticed a quilt covering what appeared to be small kegs. The Sheriff discovered about twenty-five gallons of whiskey and the two men, who admitted owning the car and the whiskey, were arrested. The trial court denied a motion to suppress and Kelly appealed arguing that the Sheriff did not have probable cause for the search.

Writing for the court, Chief Justice Blume said the court "might not have been satisfied" if the probable cause for the search had depended solely on the telephone information from the Deputy Sheriff. *Id.* at 460, 268 P. at 572. The Washakie County Sheriff's confirmation of the description of the car's occupants, the confirmation of the car's description, the suspicious actions of the men when observed by the Sheriff, the outside appearance of the contents of the car, and the Sheriff's observation of the manner in which the contents were covered all provided "additional assurance" that the telephone information was accurate. *Id.* at 459, 268 P. at 572. The court acknowledged that at the suppression hearing the Deputy Sheriff had testified he did not provide the information, but the fact finder's determination of veracity was binding. The court cautioned that the potential is always present for

> pretending that such information as here mentioned has been given, and if such information has not in fact been given, or if it cannot be said that the officer making the search had a right to believe the informant as a creditable person and as a person who under the circumstances of the case had reasonable cause to believe the truth of the information given, or possibly—a point we need not decide—if it should appear that the informant did not in fact have reasonable cause to believe the truth of the information given by him, then the court should suppress the evidence obtained by reason of such search or seizure.

*Id.* at 459–60, 268 P. at 572.

Considering the facts of *Kelly* under the standards announced today, two key distinguishing characteristics are present. First, in *Kelly*, the telephone information was provided by an identified law enforcement officer from another jurisdiction rather than by an anonymous caller. Therefore, the caller's information in *Kelly* was entitled to greater weight in a *Terry* balancing formula than would be accorded to an anonymous call. *Terry*, 392 U.S. at 21, 88 S.Ct. at 1879–80. The Wyoming Supreme Court, however, said the call alone might not be sufficient under the state constitu-

tion. *Kelly*, 38 Wyo. at 460, 268 P. at 572. Second, and most important, the Sheriff's independent observations of suspicious circumstances provided a reasonable belief that contraband was present in the car and that criminal activity was about to take place. These independent observations are consistent with the "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880.

Even after *Wolf*, 338 U.S. 25, 69 S.Ct. 1359 and *Mapp*, 367 U.S. 643, 81 S.Ct. 1684 incorporated Fourth Amendment protection to the states, Wyoming has continued to find vitality and independence in the language of our state constitution's search and seizure protection. Ruling that law enforcement authorities acted without probable cause in searching a father's ranch for goods believed stolen by a son, the court in *Smith v. State*, 557 P.2d 130, 132, 134 (Wyo.1976) said the difference in language between the Wyoming and the federal constitutions mandated that search warrants in this state be issued upon a valid affidavit. In *Parkhurst v. State*, 628 P.2d 1369, 1374 n. 7 (Wyo.1981), *cert. denied* 454 U.S. 899, 102 S.Ct. 402, 70 L.Ed.2d 216 (1981), the Wyoming Supreme Court held a passenger in a car has a legitimate expectation of privacy under Wyo. Const. art. 1, § 4 sufficient to grant standing to challenge a search or seizure. This court decided *Bonsness v. State*, 672 P.2d 1291, 1292–93 (Wyo.1983) under the Wyoming Constitution. The court stated Wyoming had never accepted the "technical and rigid requirements * * *" of the *Aguilar–Spinelli* test. *Id.* at 1293. *But see Deeter v. State*, 500 P.2d 68, 69 (Wyo.1972).

The consistent view by this court of Wyo. Const. art. 1, § 4 is that the section requires a judicial finding supported by a *written affidavit* disclosing sufficient facts to support probable cause to believe a *criminal offense is being, or is about to be, committed.* *Smith*, 557 P.2d at 133. Wyoming's Constitution, with its stronger requirement, attempts to further protect individual rights by providing a record of

the probable cause justification provided to the judicial officer. The significance of this requirement is the opportunity it provides for a complete judicial review of the reasonableness supporting a search or arrest, based on facts known at the time the warrant is requested, when compared to facts alleged under oath or affirmation as permitted in the Fourth Amendment. *Smith*, 557 P.2d at 132. The level of protection must be seen as accomplishing two goals. First, Wyoming's Constitution guarantees the rights of individuals to be free of undue restriction by the state unless *criminal conduct* is present or threatened. Second, the stronger language of the Wyoming Constitution prevents *post hoc* justification of searches or seizures.

The criminal conduct component is preserved when a law enforcement officer is making the probable cause determination under exigent circumstances. In Wyoming, the probable cause demanded for a warrantless search of an automobile and that demanded for a warrantless arrest are both defined by determining, whether, at the moment that the search or seizure is made, "the facts and circumstances within the peace officer's knowledge and of which he has reasonably trustworthy information were sufficient to warrant a reasonably cautious or prudent man to believe that the person arrested has committed or is committing an offense." *Neilson v. State*, 599 P.2d 1326, 1333 (Wyo.1979), *cert. denied* 444 U.S. 1079, 100 S.Ct. 1031, 62 L.Ed.2d 763 (1980); *accord Rodarte v. City of Riverton*, 552 P.2d 1245, 1252 (Wyo.1976).

A useful examination of the criminal conduct requirement under the Wyoming Constitution occurs in *State v. Munger*, 43 Wyo. 404, 409, 4 P.2d 1094, 1095 (1931), where this court ruled a trial court should have suppressed evidence of illegal liquor seized from an automobile. The liquor had been seized by the Goshen County, Wyoming Sheriff at the site of a large party after the Sheriff observed a visibly drunken man enter an automobile along with the vehicle's driver. The issue was whether the arrest of the drunken man was invalid, therefore requiring suppression of the liquor which had been seized without a war-

rant or probable cause. The court held that the Sheriff lacked probable cause to arrest because the Sheriff observed no illegal conduct and there was no threatened criminal activity. At the time, public drunkenness was not a crime.

In the context of a "reasonable suspicion" investigatory stop, judicial review necessarily occurs after the fact. However, Wyoming law has required that the peace officer's knowledge at the time of the stop include facts or circumstances disclosing a particular and objective basis for suspecting the particular person stopped *of criminal activity*. *Lopez*, 643 P.2d at 683; *Cook*, 631 P.2d at 8. Today, however, the court abandons the caution of requiring police observation of suspicious or criminal conduct in favor of a standard in which confirmation of innocent conduct from an anonymous caller's tip suffices.

An insightful approach listing evaluative criteria for an "indicia of reliability" from anonymous callers is offered by the Supreme Court of Washington:

> "It is difficult to conceive of a tip more 'completely lacking in indicia of reliability' than one provided by a completely anonymous and unidentifiable informer, containing no more than a conclusionary assertion that a certain individual is engaged in criminal activity. While the police may have a duty to investigate tips which sound reasonable, [1] absent circumstances suggesting the informant's reliability, or some corroborative observation which suggests either [2] the presence of criminal activity or [3] that the informer's information was obtained in a reliable fashion, a forcible stop based solely upon such information is not permissible."

*State v. Sieler*, 95 Wash.2d 43, 621 P.2d 1272, 1274–75 (1980) (*quoting State v. Lesnick*, 84 Wash.2d 940, 530 P.2d 243, 246, *cert. denied* 423 U.S. 891, 96 S.Ct. 187, 46 L.Ed.2d 122 (1975)) (hereinafter the *Washington* rule). *See also Jackson*, 688 P.2d at 141.

Three examples from Wyoming cases, while not all involving anonymous callers,

illustrate the guidance provided to law enforcement by the *Washington* rule. *Parkhurst* is an example of circumstances which suggests an informant's reliability. When police arrived at the scene of a late-night shooting in Glenrock, Wyoming, a witness described seeing two men leave the scene in a blue or green Ford and that he followed the car briefly along a route leading to Douglas, Wyoming. *Parkhurst*, 628 P.2d at 1372. A sheriff's officer stopped a blue Dodge carrying two men as it arrived in Douglas on a back road from Glenrock. The court ruled the officer had reasonable suspicion for the investigatory stop.

*Olson v. State*, 698 P.2d 107, 110–11 (Wyo.1985) is a textbook example of information from anonymous sources combined with police corroboration of criminal behavior. In *Olson*, this court affirmed a driving under the influence conviction after an investigatory stop. Various motorists, some in person and some on CB radios, reported a car driving erratically to a Wyoming Highway Patrolman who was stopped at the side of the highway. The patrolman did not stop the car based solely on the reports, he observed the suspect car speeding and weaving and hugging the side of an exit ramp. The patrolman's observations of these offenses, supported by the citizen's reports, provided a reasonable and articulable suspicion for the stop. The court specifically declined to decide if the citizen's reports alone would have been a sufficient basis for an investigatory stop.

Finally, *Lopez*, 643 P.2d at 683 represents an example of police corroboration of suspicious circumstances, a *speeding car* on a remote road, which suggests the caller's information was obtained in a reliable fashion. The *Lopez* court held an eyewitness' telephoned description to the sheriff's office of a car leaving the scene of a burglary and the eyewitness' description of the individual who had been seen in the car

earlier, when combined with a police officer's observations of the described car speeding away from the area on a remote secondary road only minutes after the burglary, were sufficient bases for an investigatory stop.

In the present case, the anonymous caller's tip to the police department in Buffalo fails to meet the *Washington* rule. First, there are no circumstances present in this record which support a finding that the police knew of the informant's reliability. The record also fails to disclose if the police had any foundation for believing the anonymous caller's claim that a drug transaction might take place. Second, the police corroboration of criminal activity is totally absent. By stopping the car as it entered Sheridan, the police cannot confirm even that a drug transaction was planned or might have taken place. Third, the corroboration of the vehicle description and its arrival in Sheridan are insufficient to show the informant's information regarding criminal activity was reliable.[3] The police corroboration of the vehicle description, a collateral detail, only established that the anonymous caller knew or observed the kind of car Goettl drove.

The United States Supreme Court addressed the deficiency of simply corroborating the vehicle description in *Whiteley v. Warden, Wyoming State Penitentiary*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). The United States Supreme Court held the officer's corroborative observation of a vehicle description did not, in itself, suggest criminal activities and does not support an inference that the anonymous caller is reliable or the anonymous caller's conclusion that criminal activity was about to occur or had occurred. The corroboration that the vehicle entered Sheridan only justifies an inference that the anonymous caller had some knowledge of Goettl and

---

**3.** If reliability rather than due process is the current constitutional concept in vogue, perhaps the most reliable proof of the unreliability of the informant's information was that after the stop, Goettl, as the targeted person for the anonymous call, did not in fact have any controlled substance in his possession. This failure of confirmation was hardly otherwise replaced in

valid justification by the highly unusual arrest and trip to jail for the insignificant offense of driving with an expired driver's license. For all we know from this record, the tipster may have been a female "friend" of the passenger who was, at the stop, the person found to be in possession in transporting among the five persons in the travelling vehicle.

his activities, it does not justify an inference of criminal activity. *Jackson*, 688 P.2d at 140.

In the context of an investigatory stop predicated on an unknown informant's tip, our state constitution provides greater protection than the federal constitution by requiring, at a minimum, that police confirmation of innocent conduct is an insufficient justification for a stop. Other jurisdictions have accepted this concept. *See, e.g., Lyons*, 564 N.E.2d at 392; *Kennison*, 590 A.2d at 1101; *Bedolla*, 111 N.M. at 451, 806 P.2d at 591; and *Crockett*, 803 S.W.2d at 311. This requirement is consistent with past interpretations of this court and provides the protection the citizens of Wyoming demanded when they met in September of 1889 to draft our Constitution and establish an independent Supreme Court to provide "the greatest safeguard to the public." *See Journal and Debates, supra*, at 333 (Comments of Delegate Potter).

## VII. CONCLUSION

It is unfortunate that we leave to criminals the protection of our rights against unreasonable search and seizure, for they make unsympathetic totems. Yet, it should never be forgotten that the interpretations given to those rights affect both the innocent and the guilty. *Sokolow*, 490 U.S. at 10–11, 109 S.Ct. at 1587, Marshall, J., dissenting. The anonymous individual with access to a telephone should not be given the power to compromise constitutional principles protecting against unreasonable search and seizure. Society's only protection against such abuse is requiring police corroboration of elements of criminal conduct as a component of the "reasonable suspicion" necessary for an investigatory stop.

For whom the bell tolls—when constitutional rights are denigrated, disregarded or extinguished. It tolls for all of you—whether in fact fairly innocent or completely guilty. Eldon D. Wedlock, Jr., *Car 54— How Dare You!: Toward a Unified Theory of Warrantless Automobile Searches*, 75 Marq.L.Rev. 79 (1991); Steve France,

*First Principles. Rights of Past and Future*, 77 ABA Journal 38 (August 1991).

I respectfully dissent from this court's justification of the warrantless stop on the basis presented here and subsequent denied suppression of evidence which was developed following the arrest and jail incarceration.