Shane Lewis FREDERICK,
Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 98–269.

Supreme Court of Wyoming.

May 28, 1999.

Sylvia Lee Hackl, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Monique McBride, Assistant Appellate Counsel, Representing Appellant.

Gay Woodhouse, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Theodore E. Lauer, Faculty Director of the Prosecution Assistance Program; and David C. Smith, Student Intern for the Prosecution Assistance Program, Representing Appellee.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN and HILL, JJ.

MACY, Justice.

Appellant Shane Frederick appeals from the order which was entered after he conditionally pleaded guilty to one count of conspiracy to deliver a controlled substance, one count of possession with the intent to deliver a controlled substance, and one count of felony possession of a controlled substance.

We affirm.

## ISSUES

Frederick presents a single issue for our analysis:

> Whether the illegal stop of the appellant violated his constitutional rights as guaranteed by the Fourth Amendment of the United States Constitution and Art. 1 § 4 of the Wyoming Constitution.

## FACTS

On December 16, 1997, Michael Mathews, a chief deputy sheriff with the Roosevelt County sheriff's office in Wolf Point, Montana, received a call from a confidential informant. Chief Deputy Mathews knew the informant and had received credible and reliable information from the informant on two prior occasions within a two-month period.

The informant stated that Michelle Buckles and "Spook" Frederick were on their way to Denver, Colorado, in a red Dodge Daytona to purchase some marijuana and methamphetamine. The informant advised that the two people had left Poplar, Montana, on December 15th and were expected to return late on December 16th. The informant gained this knowledge from a conversation that he overheard between Buckles and a third party on December 15th. The next day, the informant spoke directly with the third party, and that party confirmed the information.

Using a motor vehicle division's computer ABC check, Chief Deputy Mathews determined the year and the license plate number of a red Dodge Daytona which was registered to Michelle Buckles. He knew that Buckles was an Indian female, so he examined the tribal enrollment book to ascertain her birth date. He also knew that "Spook" Frederick's real name was Shane Frederick.

Armed with this information, Chief Deputy Mathews transmitted a teletype, known as a BOLO, to other law enforcement agencies, including the Gillette police department, asking them to be on the lookout for these two individuals who were making a drug run. The teletype read in pertinent part:

> BOLO for a 1989 red Dodge Daytona MT lic/17–1464B driver reported to be Michele Buckles, Indian female DOB of 05–16–68 and a Shane Fredericks, white male, departed Poplar Montana on 12–15–97 to Denver CO to obtain illegal drugs due back late 12–16–97 if probable cause stop and attempt consent to search and notify this station of any contacts or sightings thank you for any and all assistance

Greg Brothers, a police officer for the Gillette police department, was on duty on December 16, 1997. He read the teletype shortly after it arrived and committed its contents to memory. He began his patrol and watched for the 1989 red Dodge Daytona.

At approximately 1:51 a.m. on December 17, 1997, Officer Brothers was at a stoplight when he observed a red Dodge Daytona, which had been traveling in a northerly di-

rection, pull into a convenience store parking lot. The officer drove into the parking lot to examine the car's license plate. The license plate number matched the number in the teletype. While he was surveying the car, Officer Brothers saw two individuals standing outside the car who matched the descriptions contained in the teletype. He proceeded to the rear of the store and watched to see whether the vehicle would continue in a northerly direction when it left the parking lot. He witnessed the vehicle depart the parking lot, and he followed it north onto Highway 14/16. As the vehicle was leaving the city limits, Officer Brothers requested assistance from the sheriff's office. He followed the car north on Highway 14/16 and then right on Broadus Y to Highway 59. At Highway 59, the vehicle turned and headed north. Officer Brothers did not follow the vehicle when it turned onto Highway 59 because he knew that Ed Mayer, a deputy sheriff with the Campbell County sheriff's office, was on his way. When Deputy Mayer arrived, Officer Brothers informed him that the vehicle was continuing in a northbound direction towards Montana.

Deputy Mayer proceeded north at a high rate of speed. He caught up to the car after traveling about six miles, and he activated his dash-mounted video camera. At this point, Deputy Mayer estimated that the vehicle was moving at 60–65 miles per hour. The posted speed limit on this stretch of road was 65 miles per hour. Over the next few miles, the vehicle slowed its speed to around 45 miles per hour. Deputy Mayer could see that the vehicle was red. He also used his field glasses to read the license plate number and confirmed that this was the vehicle identified in the teletype.

Deputy Mayer decided that he would stop the car somewhere around the Cow Creek turnoff. While he was following the vehicle, he witnessed the car drift over to the right side of the road and travel on the fog line for approximately one-eighth of a mile. The video camera, however, did not capture this activity. Deputy Mayer also witnessed the driver frequently looking in the rearview mirror and the passenger looking back at his car. As he was approaching the Cow Creek

area, Deputy Mayer activated his overhead emergency red lights. He also turned on his take-down lights and one spotlight. After he had turned on all the lights, he saw a third person, who was in the back seat, sit up from a prone position and move something over the back seat which appeared to be a yellow bag and some clothes.

Deputy Mayer stopped the vehicle and determined that Frederick was in the passenger seat, Buckles was in the back seat, and Rose Mary Ferguson was driving the car. He requested that a drug canine be dispatched to the scene. While they were waiting for the drug canine, another deputy sheriff from the Campbell County sheriff's office arrived. This deputy explained the teletype to Buckles, and she gave her consent for the car to be searched. The drug canine subsequently arrived. It entered the car and indicated that a yellow bag, which was located in the back of the vehicle, contained drugs. A search of the bag revealed two large bags of marijuana, and all three individuals were arrested. Twenty-eight minutes elapsed from when the vehicle was stopped until the arrests were made.

Frederick was charged with one count of conspiring to deliver a controlled substance, one count of unlawfully possessing a controlled substance with the intent to deliver, and one count of possessing a controlled substance. He filed a motion to suppress the evidence which had been obtained as a result of the search, claiming that the search was illegal because the officers did not possess a reasonable articulable suspicion of illegal activity to justify a stop of the vehicle. After a hearing on the matter, the district court denied the motion. Frederick pleaded guilty to the offenses charged but reserved his right to appeal from the denial of his motion to suppress. He was fined $4,000 and sentenced to be incarcerated for two consecutive terms of not less than twenty-four months nor more than sixty months for the conspiracy and the possession-with-intent-to-deliver charges, and he was fined $500 and sentenced to be incarcerated for a term of not less than ten months nor more than sixty months for the possession charge with this term to run concurrently with the term for

the possession-with-intent-to-deliver charge but consecutively to the term for the conspiracy charge. Frederick appeals to this Court.

## STANDARD OF REVIEW

■ This Court will not disturb a district court's evidentiary rulings in the absence of an abuse of discretion. *Burgos–Seberos v. State,* 969 P.2d 1131, 1133 (Wyo. 1998). When we review a district court's ruling on a motion to suppress evidence, we do not interfere with the findings of fact unless they are clearly erroneous. *Gehnert v. State,* 956 P.2d 359, 361 (Wyo.1998). When the district court has not made specific findings of fact, we will uphold its general ruling if the ruling is supportable by any reasonable view of the evidence. *Borgwardt v. State,* 946 P.2d 805, 807 (Wyo.1997). We consider the evidence in the light most favorable to the district court's ruling because of the district court's ability to assess "the credibility of the witnesses, weigh the evidence, and make the necessary inferences, deductions, and conclusions" at the hearing on the motion. *Gehnert,* 956 P.2d at 361. The constitutionality of a particular search or seizure is, however, a question of law which we review *de novo. Id.*

## DISCUSSION

Frederick claims that Deputy Mayer lacked a reasonable articulable suspicion of illegal activity to justify the investigatory stop of the vehicle. We disagree.

■ We have consistently held that something less than probable cause will suffice to justify an investigatory stop. *Goettl v. State,* 842 P.2d 549, 554 (Wyo.1992). We will not require a police officer to " 'simply shrug his shoulders and allow a crime to occur merely because he lacks the necessary information required for probable cause to arrest.' " 842 P.2d at 555 (quoting *Olson v. State,* 698 P.2d 107, 109–10 (Wyo.1985)). An investigatory stop "requires only the presence of specific and articulable facts and rational inferences which give rise to a reasonable suspicion that a person has committed or may be committing a crime." *Wilson v. State,* 874 P.2d 215, 220 (Wyo.1994). The

validity of such a stop depends on whether, in light of the totality of the circumstances, an officer possessed sufficient information to create such a reasonable suspicion. *Goettl,* 842 P.2d at 554; *see also Cook v. State,* 631 P.2d 5, 8 (Wyo.1981). In applying the totality of the circumstances test to situations involving a confidential informant's tip, we consider: "(1) the sufficiency of the information set forth in the informant's tip; (2) the prediction of future activity or events by the informant; and (3) some corroboration of the current and predicted future events by the police officers." *Goettl,* 842 P.2d at 554.

The facts of this case are remarkably similar to the facts in *Goettl.* In that case, a dispatcher for the Johnson County sheriff's office in Buffalo received an anonymous telephone call from an individual who advised that Goettl's brother had " 'a lot of acid.' " 842 P.2d at 550. The caller explained that Goettl had brought the acid from Colorado and that the brothers planned to go to Sheridan in Goettl's silver Volvo with Colorado license UKB 606 to sell the drug. 842 P.2d at 550–51. The informant said that the Volvo was parked in front of Goettl's brother's house at 178 Western Avenue in Buffalo and that the brothers were getting ready to leave. 842 P.2d at 551.

A Buffalo police officer drove by the house and saw the silver Volvo parked in the driveway with the passenger door open. *Goettl,* 842 P.2d at 551. The make of the car, the license number, and the location all matched the information which the informant had given. *Id.* The officer proceeded to Buffalo's north exit. *Id.* About twenty minutes later, he saw the Volvo, which was traveling north toward Sheridan, go by with at least four people inside. *Id.* The officer notified a drug task force agent, and the agent in turn notified the supervisor of the Northeast Drug Enforcement Team in Sheridan. *Id.* The supervisor left Sheridan and traveled toward Buffalo after he had notified officers of the Sheridan police department that they should watch for the Volvo. *Id.* The supervisor saw the Volvo traveling north, and he turned around and followed it. *Id.* He lost sight of it, however, when he missed the exit that the Volvo took into Sheridan. *Id.* A Sheridan

police officer observed the Volvo and pulled it over. *Id.* Goettl, who was driving, presented a suspended Wyoming driver's license, and the officer arrested him. *Id.* The supervisor arrived a few minutes later and advised Goettl of his rights. *Id.* Goettl gave his consent for a search to be made of both his person and the vehicle that he was driving. *Id.*

After considering the totality of the circumstances and relying upon the United States Supreme Court's decision in *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), we concluded that a reasonable suspicion existed to justify the investigatory stop of Goettl's car. *Goettl*, 842 P.2d at 555. We held that the law enforcement officers possessed at least a reasonable suspicion, and in fact probable cause, to stop Goettl's vehicle given the prediction of future events, the details of which were verified by the law enforcement officers' observation.

■ In the case at bar, the confidential informant who provided the information was considered to be quite reliable. The informant had provided accurate information on two previous occasions and, in fact, had never provided unreliable information. Additionally, the informant voluntarily gave the information. The informant was neither paid nor granted a benefit, consideration, or lenience for a criminal activity. Instead, the informant was a concerned citizen who was hoping to hinder the large amount of drug trafficking which was occurring within the Fort Peck Indian Reservation and the Fort Peck housing areas.

The informant provided information which included the names and descriptions of two of the individuals who were involved; the color, make, and model of the vehicle that they were using; and that they were expected to be returning to Poplar, Montana, late on December 16th from a drug run to Denver, Colorado. Before they stopped the vehicle, law enforcement officers confirmed the information which the informant had given—including the prediction of the future events that these individuals would be driving this particular car and that they would be heading in a northerly direction back to Poplar within a reasonable time frame of that which the informant had reported.

In an effort to avoid the conclusion that a reasonable articulable suspicion justified the stop of the vehicle, Frederick suggests that the officer who receives a tip that illegal activity is or will be occurring must be the officer who corroborates the information before an investigatory stop can be warranted. Our *Goettl* decision undermines this argument. In that case, the dispatcher for the Johnson County sheriff's office received a tip from the informant. The dispatcher relayed the information on to a Buffalo police officer who partially corroborated it and then passed it on to a drug task force agent. The agent reported the information to the supervisor of the Northeast Drug Enforcement Team who arranged for officers of the Sheridan police department to stop the vehicle. That case demonstrates that law enforcement agencies can build upon reliable information which has been supplied by other law enforcement agencies. As long as the totality of the circumstances suggests that the information has been corroborated in such a manner that it gives rise to the existence of the necessary reasonable-articulable-suspicion requirement, we will conclude that the investigatory stop was warranted.

We hold that the degree of particularity in the facts furnished by the informant, coupled with the corroboration of the prediction of future events, gave the officers a reasonable articulable suspicion that the informant had provided accurate information and that the individuals were indeed engaging in illegal activity. As a result of the subsequent consent given by Buckles for her car to be searched, evidence was found which justified the arrest of the vehicle's occupants.

Affirmed.