Michelle BUCKLES, Appellant
(Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

Supreme Court of Wyoming.

Feb. 29, 2000.

Representing Appellant: Sylvia Lee Hackl, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Monique McBride, Assistant Appellate Counsel.

Representing Appellee: Gay Woodhouse, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Kimberly A. Baker, Senior Assistant Attorney General; Theodore E. Lauer, Director of the Prosecution Assistance Program; and Christopher C. Voigt, Student Intern for the Prosecution Assistance Program.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN, and HILL, JJ.

LEHMAN, Chief Justice.

Appellant Michelle Buckles entered a conditional plea of guilty to conspiracy to deliver a controlled substance, reserving the right to appeal from the denial of her motion to suppress. Buckles argues her constitutional rights were violated when the police officer stopped her vehicle and searched it in response to a be-on-the-lookout (BOLO) report. We disagree and affirm.

### ISSUE

Buckles presents one issue for our review:

Whether the illegal stop of the appellant violated her constitutional rights as guaranteed by the Fourth Amendment of the United States Constitution and Art. 1 § 4 of the Wyoming Constitution.

The state, as appellee, states the issue in this manner:

Did the investigatory stop, after corroboration of an informant's tip, and the ensuing consensual search violate Appellant's constitutional rights as guaranteed by the Fourth Amendment of the United States Constitution and Article 1, Section 4 of the Wyoming Constitution?

### FACTS

The facts before us are identical to those in *Frederick v. State*, 981 P.2d 494 (Wyo.1999), a case that involved Buckles' co-defendant, Shane Frederick. For ease of the reader, we restate those facts below:

On December 16, 1997, Michael Mathews, a chief deputy sheriff with the Roosevelt County sheriff's office in Wolf Point, Montana, received a call from a confidential informant. Chief Deputy Mathews knew the informant and had received credible and reliable information from the informant on two prior occasions within a two-month period. The informant stated that Michelle Buckles and "Spook" Frederick were on their way to Denver, Colorado, in a red Dodge Daytona to purchase some marijuana and methamphetamine. The informant advised that the

two people had left Poplar, Montana, on December 15th and were expected to return late on December 16th. The informant gained this knowledge from a conversation that he overheard between Buckles and a third party on December 15th. The next day, the informant spoke directly with the third party, and that party confirmed the information.

Using a motor vehicle division's computer ABC check, Chief Deputy Mathews determined the year and the license plate number of a red Dodge Daytona which was registered to Michelle Buckles. He knew that Buckles was an Indian female, so he examined the tribal enrollment book to ascertain her birth date. He also knew that "Spook" Frederick's real name was Shane Frederick.

Armed with this information, Chief Deputy Mathews transmitted a teletype, known as a BOLO, to other law enforcement agencies, including the Gillette police department, asking them to be on the lookout for these two individuals who were making a drug run. The teletype read in pertinent part:

"BOLO for a 1989 red Dodge Daytona MT lic/17–1464B driver reported to be Michele Buckles, Indian female DOB of 05–16–68 and a Shane Fredericks, white male, departed Poplar Montana on 12–15–97 to Denver CO to obtain illegal drugs due back late 12–16–97 if probable cause stop and attempt consent to search and notify this station of any contacts or sightings thank you for any and all assistance"

Greg Brothers, a police officer for the Gillette police department, was on duty on December 16, 1997. He read the teletype shortly after it arrived and committed its contents to memory. He began his patrol and watched for the 1989 red Dodge Daytona.

At approximately 1:51 a.m. on December 17, 1997, Officer Brothers was at a stoplight when he observed a red Dodge Daytona, which had been traveling in a northerly direction, pull into a convenience store parking lot. The officer drove into the parking lot to examine the car's license

plate. The license plate number matched the number in the teletype. While he was surveying the car, Officer Brothers saw two individuals standing outside the car who matched the descriptions contained in the teletype. He proceeded to the rear of the store and watched to see whether the vehicle would continue in a northerly direction when it left the parking lot. He witnessed the vehicle depart the parking lot, and he followed it north onto Highway 14/16. As the vehicle was leaving the city limits, Officer Brothers requested assistance from the sheriff's office. He followed the car north on Highway 14/16 and then right on Broadus Y to Highway 59. At Highway 59, the vehicle turned and headed north. Officer Brothers did not follow the vehicle when it turned onto Highway 59 because he knew that Ed Mayer, a deputy sheriff with the Campbell County sheriff's office, was on his way. When Deputy Mayer arrived, Officer Brothers informed him that the vehicle was continuing in a northbound direction towards Montana.

Deputy Mayer proceeded north at a high rate of speed. He caught up to the car after traveling about six miles, and he activated his dash-mounted video camera. At this point, Deputy Mayer estimated that the vehicle was moving at 60–65 miles per hour. The posted speed limit on this stretch of road was 65 miles per hour. Over the next few miles, the vehicle slowed its speed to around 45 miles per hour. Deputy Mayer could see that the vehicle was red. He also used his field glasses to read the license plate number and confirmed that this was the vehicle identified in the teletype.

Deputy Mayer decided that he would stop the car somewhere around the Cow Creek turnoff. While he was following the vehicle, he witnessed the car drift over to the right side of the road and travel on the fog line for approximately one-eighth of a mile. The video camera, however, did not capture this activity. Deputy Mayer also witnessed the driver frequently looking in the rearview mirror and the passenger looking back at his car. As he was approaching the Cow Creek area, Deputy Mayer activated his overhead emergency red lights. He also turned on his takedown lights and one spotlight. After he had turned on all the lights, he saw a third person, who was in the back seat, sit up from a prone position and move something over the back seat which appeared to be a yellow bag and some clothes.

Deputy Mayer stopped the vehicle and determined that Frederick was in the passenger seat, Buckles was in the back seat, and Rose Mary Ferguson was driving the car. He requested that a drug canine be dispatched to the scene. While they were waiting for the drug canine, another deputy sheriff from the Campbell County sheriff's office arrived. This deputy explained the teletype to Buckles, and she gave her consent for the car to be searched. The drug canine subsequently arrived. It entered the car and indicated that a yellow bag, which was located in the back of the vehicle, contained drugs. A search of the bag revealed two large bags of marijuana, and all three individuals were arrested. Twenty-eight minutes elapsed from when the vehicle was stopped until the arrests were made.

981 P.2d at 495–96.

Buckles was charged with one count of conspiring to deliver a controlled substance. She filed a motion to suppress the evidence obtained as a result of the search, claiming the search was illegal because the officers did not possess a reasonable, articulable suspicion of illegal activity to justify a stop of the vehicle. After a hearing on the matter, the district court denied the motion. Buckles pleaded guilty to the offense charged but reserved her right to appeal from the denial of her motion to suppress. She was fined $2,500 and sentenced to be incarcerated for a term of not less than eighteen months nor more than sixty months. The sentence of incarceration was suspended, and a split sentence was imposed whereby Buckles was to serve sixty days in prison following which, if she abided by the rules and cooperated, she would be placed on probation. Buckles appeals to this Court.

## STANDARD OF REVIEW

 Our standard of review is found in *Frederick:*

When we review a district court's ruling on a motion to suppress evidence, we do not interfere with the findings of fact unless they are clearly erroneous. When the district court has not made specific findings of fact, we will uphold its general ruling if the ruling is supportable by any reasonable view of the evidence. We consider the evidence in the light most favorable to the district court's ruling because of the district court's ability to assess "the credibility of the witnesses, weigh the evidence, and make the necessary inferences, deductions, and conclusions" at the hearing on the motion. The constitutionality of a particular search or seizure is, however, a question of law which we review *de novo.*

981 P.2d at 497 (quoting *Gehnert v. State,* 956 P.2d 359, 361 (Wyo.1998)) (citations omitted); see also *McChesney v. State,* 988 P.2d 1071, 1074 (Wyo.1999).

## DISCUSSION

 The state concedes this was an investigatory stop. An investigatory stop " 'requires only the presence of specific and articulable facts and rational inferences which give rise to a reasonable suspicion that a person has committed or may be committing a crime.' " *Frederick,* 981 P.2d at 497 (quoting *Wilson v. State,* 874 P.2d 215, 220 (Wyo. 1994)). "The validity of such a stop depends on whether, in light of the totality of the circumstances, an officer possessed sufficient information to create such a reasonable suspicion." *Id.* (citing *Goettl v. State,* 842 P.2d 549, 554 (Wyo.1992)). We examine a confidential informant's tip under the totality of the circumstances, taking into consideration: "(1) the sufficiency of the information set forth in the informant's tip; (2) the prediction of future activity or events by the informant; and (3) some corroboration of the current and predicted future events by the police officers." *Goettl,* 842 P.2d at 554.

Recently, in *McChesney,* we considered tips from an anonymous informant in an investigatory automobile stop setting. We held an anonymous REDDI tip by itself was not sufficient to warrant an investigatory stop. 988 P.2d at 1077. We distinguished tips from an anonymous informant from those of an identified citizen-informant, stating tips from the latter "are higher on the reliability scale because an identified informant exposes himself to possible criminal and civil prosecution if the report is false." 988 P.2d at 1076. In Buckles' case, the informant being confidential rather than anonymous increased the degree of reliability. In addition, the informant was neither paid nor granted a benefit, consideration, or lenience for a criminal activity but rather was a "concerned citizen who was hoping to hinder the large amount of drug trafficking which was occurring within the Fort Peck Indian Reservation and the Fort Peck housing areas." *Frederick,* 981 P.2d at 498. Finally, to further bolster the informant's reliability, the informant had provided accurate information to officers twice within sixty days prior to the tip in this case.

The informant's tip included the names and descriptions of two of the individuals who were involved, along with the color, make, and model of the vehicle they were using. The tip also provided their destination and their expected date and time of return to Poplar, Montana. The officers corroborated this information when they observed the vehicle described in the BOLO report traveling toward Montana, as the tip provided, within a reasonable time frame of that which the informant reported. "[T]he degree of particularity in the facts furnished by the informant, coupled with the corroboration of the prediction of future events, gave the officers a reasonable articulable suspicion that the informant had provided accurate information and that the individuals were indeed engaging in illegal activity." *Id.*

As we recognized in *Frederick,* the facts here are similar to *Goettl,* 842 P.2d 549. In *Goettl,* we concluded that, because the law enforcement officer possessed at least a reasonable suspicion and, in fact, probable cause, the prediction of future events given by the informant was verifiable by the law enforcement officers' observations. Moreover,

law enforcement agencies can build upon reliable information which has been supplied by other law enforcement agencies. As long as the totality of the circumstances suggests that the information has been corroborated in such a manner that it gives rise to the existence of the necessary reasonable-articulable-suspicion requirement, we will conclude that the investigatory stop was warranted.

*Frederick*, 981 P.2d at 498.

### CONCLUSION

The totality of the circumstances supports the district court's findings that the officers had a reasonable, articulable suspicion to stop Buckles' vehicle. As a result of her consent to search the car, the evidence found justified her arrest, and we conclude no constitutional rights were violated. We, therefore, affirm.