2001 WY 15

**Robert NIXON, Appellant (Defendant),**

**v.**

**The STATE of Wyoming,**
**Appellee (Plaintiff).**

**No. 00–85.**

Supreme Court of Wyoming.

Feb. 13, 2001.

Representing Appellant: Sylvia Lee Hackl, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Marion Yoder, Senior Assistant Public Defender. Argument by Ms. Yoder.

Representing Appellee: Gay Woodhouse, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General;

and Kimberly A. Baker, Senior Assistant Attorney General. Argument by Ms. Baker.

Before LEHMAN, C.J., and THOMAS *, GOLDEN, HILL, and KITE, JJ.

HILL, Justice.

[¶ 1] Robert Nixon (Nixon) pleaded guilty to one count of felony possession of a controlled substance in violation of Wyo. Stat. Ann. § 35-7-1031(c)(ii) (LEXIS 1999), conditioned upon appeal of the district court's order denying his motion to suppress evidence discovered through a warrantless search of his person. We affirm.

[¶ 2] Nixon raises two issues on appeal:

*Issue I*

Probation and parole agents should not serve as "stalking horses" so that DCI drug investigators may evade the requirements of the Fourth Amendment and those of the Wyoming Constitution.

*Issue II*

Evidence derived from the search of appellant's person should have been suppressed as appellant's "consent" to the search was not voluntary.

The State responds with a single issue:

Whether the district court properly denied appellant's motion to suppress?

## FACTS

[¶ 3] Nixon is a Colorado probationer subject to supervision by the Wyoming Department of Probation and Parole pursuant to the terms of an Interstate Compact. According to the terms of his probation, Nixon agreed he would "submit [his] person, property, place of residence, vehicle and personal effects to search and seizure at any time, with or without a search warrant, whenever reasonable cause is determined by a Probation and Parole Agent."

[¶ 4] On October 16, 1999, two probation agents conducted a routine home visit with Nixon. The agents observed several items in plain view indicating possible drug or alcohol usage in violation of the terms of Nixon's probation. The agents left Nixon's residence and returned to their office for a discussion with their supervisor about the possible probation violations. After obtaining permission for a search of Nixon's residence from their supervisor, the agents contacted the Albany County Sheriff's Department for assistance. The agents returned to Nixon's residence accompanied by two Sheriff's deputies. A thorough search revealed numerous items indicative of possible illegal activity at the residence. Among the items were a soda can converted into a marijuana pipe, a burned piece of aluminum foil with suspected drug residue on it, a plastic container with suspected marijuana residue, and an Altoids box containing a razor blade that had a white residue on it. In addition, the agents noted the presence of various articles suggesting the manufacture of methamphetamine: containers of bleach, kerosene, lighter and transmission fluid, buckets of water, numerous empty bottles of ephedrine, opened soda cans with unidentifiable liquids inside, plastic tubing, and a hot plate.

[¶ 5] After the search, the agents consulted with their supervisor and determined that a second search should be undertaken. Based on the presence of a possible methamphetamine lab, the agents contacted the Department of Criminal Investigation (DCI). The second search was scheduled for October 22, 1999. Initially, the two probation agents approached Nixon's residence while the DCI agents waited in a car out of sight of the residence. The plan was for the DCI agents to approach Nixon's residence only after the probation agents had made contact with Nixon and explained the situation to him. The arrangement was intended to promote cooperation and a calm atmosphere and to avoid any panic or conflict that could result if the search was perceived as a raid.

[¶ 6] Accordingly, the probation agents approached Nixon's residence and knocked on the door, but there was no answer. As the agents were beginning to walk back to their vehicle, Nixon drove up in his truck. Nixon approached the agents who explained that they were there to do another search of the residence. The agents also informed

* Concurred prior to retirement.

Nixon that DCI would be assisting them. While this information was being relayed to Nixon, one of the agents contacted the DCI agents by cell phone, and they proceeded to drive up to the residence. Nixon gave permission for a search of his residence. Two of the DCI agents secured the residence while the third remained outside with the two probation agents. A probation agent then asked Nixon if he would submit to a search of his person by the DCI agent for weapons and/or contraband. Nixon responded, "Okay. Go ahead." Nixon and the agents testified that the atmosphere was calm and cooperative without threats or intimidation. The DCI agent's search of Nixon's person disclosed the presence of a plastic bag containing 22 grams of a white powdery substance later identified as cocaine.

[¶ 7] Nixon was charged with one count of felony possession of a controlled substance in violation of Wyo. Stat. Ann. §§ 35–7–1031(c)(ii) and 35–7–1016(b)(iv) (LEXIS 1999). In response, Nixon filed a Motion to Suppress Results of Search. After a hearing, the district court issued a decision letter and order denying the motion. The district court's decision was based on two grounds. First, the court held that under the circumstances, Nixon's consent was voluntary. In addition, the court concluded that the agents had reasonable suspicion to search Nixon's person based on the previous discovery of items in the residence indicative of drug and alcohol usage in violation of the terms of his probation. Subsequently, Nixon pleaded guilty to the charge of possession conditioned on the right to appeal the denial of his motion to suppress pursuant to W.R .Cr.P. 11(a)(2).

## STANDARD OF REVIEW

[¶ 8] When reviewing a district court's ruling on a motion to suppress evidence, we will not interfere with findings of fact unless they are clearly erroneous. *Buckles v. State*, 998 P.2d 927, 930 (Wyo. 2000) (quoting *Frederick v. State*, 981 P.2d 494, 497 (Wyo.1999) and *Gehnert v. State*, 956 P.2d 359, 361 (Wyo.1998)). On appeal, we consider the evidence in the light most favorable to the district court's ruling because that court is best situated to assess the credibility of the witnesses, weigh the evidence, and make all necessary inferences, deductions, and conclusions. *Id.* The constitutionality of any particular search or seizure is a question of law that we review *de novo*. *Putnam v. State*, 995 P.2d 632, 635 (Wyo.2000) (quoting *Burgos–Seberos v. State*, 969 P.2d 1131, 1133 (Wyo.1998)).

## DISCUSSION

[¶ 9] Nixon frames his appeal in the context of two issues. In the first, Nixon challenges the propriety of the second search of the residence. Nixon's probation agreement required him to submit to warrantless searches of his residence or person upon reasonable cause of a probation violation. Nixon acknowledges that certain items found in his house during the October 16 visit by the probation agents indicated a potential probation violation. However, Nixon argues that the second search went beyond any attempt to discern a probation violation. He claims that DCI impermissibly used his status as a probationer as a subterfuge for avoiding a search warrant. In his second issue, Nixon contends that the consent given to search his person was not voluntary. He claims he was intimidated by the presence of the armed DCI agents. Furthermore, Nixon alleges that he erroneously believed that he had to consent to the body search or be in violation of his probation.

[¶ 10] Initially, we must address the State's contention that Nixon did not challenge the propriety of the residence search before the district court. A review of the record discloses that at the motion hearing Nixon's counsel repeatedly stated that he was only challenging the search of Nixon's person and not the search of the house. Normally, we would decline to consider an argument not raised before the court below. *Bailey v. State*, 12 P.3d 173 (Wyo.2000). However, one of the grounds relied upon by the district court in denying Nixon's motion to suppress was that the body search was supported by the existence of a reasonable suspicion to search the residence based on the items observed in the first search. This arguably raises a collateral issue as to the

propriety of the residence search. In that context, we will discuss the issue raised by Nixon.

[¶ 11] The United States Supreme Court explored the constitutional limits applicable to probation searches in *Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). At issue was a state regulation that permitted a probation officer to search a probationer's residence without a warrant if there was a reasonable suspicion of contraband and a supervisor approved the search. 483 U.S. at 873, 107 S.Ct. at 3168. The Court acknowledged that the Fourth Amendment protects a probationer, like anyone else. *Id.* However, neither probationers nor parolees enjoy " 'the absolute liberty to which every citizen is entitled, but only ... conditional liberty properly dependent on observance of special [probation] restrictions.' " 483 U.S. at 874, 107 S.Ct. at 3169 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)). "A State's operation of a probation system, like its operation of a school, government office or prison, or its supervision of a regulated industry, likewise presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." 483 U.S. at 873–74, 107 S.Ct. at 3168. The court held that the state's 'special needs' in maintaining a supervisory probation system justified a warrantless search based on a reasonable suspicion pursuant to a valid state regulation.[1] 483 U.S. at 880, 107 S.Ct. at 3172.

[¶ 12] We considered an analogous situation in *Pena v. State*, 792 P.2d 1352 (Wyo.1990). Parole officers acting on an anonymous tip that Pena possessed cocaine conducted a warrantless search of Pena's residence. 792 P.2d at 1358. At the suppression hearing, Pena argued that the August 5th search violated his fourth amendment rights because it was conducted without a warrant and without his consent. The trial court ruled there was consent and denied Pena's motion to suppress.

The trial court coupled Pena's invitation to the parole officers to enter his house, with the fact that Pena, as one of the conditions for his parole, had signed a "Parole Agreement and Parole Grant" (Agreement), to find that Pena had consented to the search. Pena's parole officer testified at the suppression hearing that the Agreement granted the parole officers the "authority" to conduct a warrantless search of Pena's house. The state's argument is that Pena, through his signature on the parole agreement, agreed that his house was subject to a search "at any time." We agree that Pena's status as a parolee permits parole officers to conduct warrantless searches of his home. Pena, however, is still entitled to the fourth amendment mandate that searches be "reasonable."

In other words, a warrant based upon probable cause is not generally required before a parole officer may conduct a search to determine whether the parolee is violating the terms of his parole. *State v. Velasquez*, 672 P.2d 1254, 1260 (Utah 1983). This does not mean, however, that individuals who have signed a parole agreement, providing for warrantless searches, relinquish their fourth amendment right to be free from unreasonable searches.

The Utah Supreme Court treats a parolee's signature on a parole agreement which permits warrantless searches as an acknowledgment that parole officers have the right to conduct *reasonable* searches. *Velasquez*, 672 P.2d at 1260 n. 4. We adopt this view.

The Utah Court has also struck the appropriate balance between the competing interests of the state and the parolee vis-a-

---

1. Nixon contends that the *Griffin* court conditioned the validity of such a search upon the existence of a specific state statute or agency regulation. Nixon argues that the State's failure to tie the search at issue in this case to any Wyoming statute or Department regulation mandates a reversal. Nixon is mistaken. The key to the *Griffin* case was the 'special needs' of the probationary system as an entirety, not necessarily a specific statutory or regulatory provision. *Griffin*, 483 U.S. at 876–77, 107 S.Ct. at 3169–70; *United States v. Lewis*, 71 F.3d 358 at 361 (10th Cir.1995).

vis [sic] reasonable searches. The Utah Court does not require that a search warrant based upon probable cause be obtained before a parolee may be searched. It does, however, require evidence: "(1) that the parole officer [had] a reasonable suspicion that the parolee has committed a parole violation or crime, and (2) that the search [was] reasonably related to the parole officer's duty." *State v. Johnson,* 748 P.2d 1069, 1072 (Utah 1987) (citing *Velasquez,* 672 P.2d at 1260). *See also People v. Anderson,* 189 Colo. 34, 536 P.2d 302, 305 (1975). Reasonable suspicion (which is a less stringent standard than probable cause) requires that the parole officer "be able to point to specific and articulable facts that, taken together with rational inferences from those facts, reasonably warrant a belief * * * that a condition of parole has been or is being violated." *Johnson,* 748 P.2d at 1072.

This approach will provide the flexibility the state needs to operate its parole system. It will also provide a check against possible state encroachment upon a parolee's fourth amendment right to be free from unreasonable searches.

*Pena,* 792 P.2d at 1356–58 (footnotes omitted) (emphasis in original). With the standards enunciated in *Griffin* and *Pena* to guide us, we turn to the search of Nixon's residence.

[¶ 13] We conclude that the probation officers had a reasonable suspicion that Nixon had committed or was committing a probation violation. The October 16, 1999, routine visit to Nixon's residence resulted in the observation of several items indicating drug and/or alcohol usage in violation of the terms of his probation. This observation led to a more thorough search by the probation agents after obtaining the approval of their supervisor. That search disclosed numerous items indicative of drug usage and possible methamphetamine manufacturing. In light of the nature of the items found during that search, we find the additional search of October 22 to be reasonable. Similarly, given that factual context, the officer's search of Nixon's person for the presence of illegal contraband was reasonable.

[¶ 14] We cannot agree with Nixon that the search of his residence pursuant to his status as a probationer was a pretext for avoiding the requirements of a search warrant. The probation officers clearly had reason to suspect that Nixon was engaged in the illegal manufacture of a controlled substance. Accordingly, it was not unreasonable for them to contact the DCI to accompany them given their knowledge and experience with methamphetamine labs. It is important to note that the search was based on information derived through the probation agents' performance of their duty and not through outside sources. Furthermore, the participation of the DCI agents was at the instigation of the probation officers.

Generally, it may be said that searches of probationers and parolees not conforming to usual Fourth Amendment standards have been upheld notwithstanding the fact that there was some degree of cooperation or joint participation by the police and a probation or parole agent. There is little reason to question this result when the facts show that police participation was brought about at the instigation of the probation officer or parole officer, for "he may enlist the aid of police officers in performing his duty."

4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 10.10(e) 792–93 (1996) (footnotes and citations omitted).

[¶ 15] We turn to consider Nixon's second issue: whether his consent to search his person was voluntary. We concur with the district court and conclude that it was.

[¶ 16] A person may waive the Fourth Amendment warrant requirement by consenting to a warrantless search. *Pena,* 792 P.2d at 1358; *Stamper v. State,* 662 P.2d 82, 86 (Wyo.1983). The question of whether consent to search was voluntary is one of fact to be determined in light of all the circumstances. *Amin v. State,* 695 P.2d 1021, 1024–25 (Wyo.1985). We view the evidence in the light most favorable to the prevailing party below. *Pena,* 792 P.2d at 1358; *Wilde v. State,* 706 P.2d 251, 256 (Wyo.1985).

[¶ 17] One of the probation agents requested permission to search Nixon for weapons and contraband. Nixon replied,

"Okay. Go ahead." This exchange took place in a non-confrontational atmosphere wherein no threats were made or implied and no weapons displayed. The voices of all the parties were calm and not raised. Nixon's complaints about the DCI agents are unpersuasive. The mere presence of the DCI agents is not enough to create a coercive atmosphere. Nor was their arrival on the scene untoward. The probation agents reasonably explained that the procedure utilized was intended to allow them the opportunity to present the situation to Nixon and maintain a calm and stable atmosphere.

[¶ 18] Finally, Nixon argued that the only reason he consented was for fear that a refusal would constitute a probation violation. Assuming that Nixon was mistaken in that belief, we see nothing that would diminish the voluntariness of his consent. None of the agents threatened Nixon with a probation violation if he refused. Nixon made no inquiry; he simply said, "Go ahead." Under these circumstances, we conclude that Nixon's consent was voluntary.

## CONCLUSION

[¶ 19] We conclude that the district court properly denied Nixon's motion to suppress based on reasonable suspicion to conduct a warrantless search and voluntary consent given by Nixon. Affirmed.